**GUARDSMARK, INC., et al., Plaintiffs,**

v.

**BLUE CROSS AND BLUE SHIELD OF TENNESSEE, Defendant.**

**No. 01–2117 MA.**

United States District Court,
W.D. Tennessee,
Western Division.

March 3, 2004.

See, also, 206 F.R.D. 202.

Jef Feibelman, W.J. Michael Cody, Douglas F. Halija, Burch, Porter & Johnson, Memphis, Alan E. Schabes, Pete C. Elliott, Jefrey D. Zimon, Mariann E. Butch, Anna K. Raske, Benesch, Friedlander, Coplan & Arnoff, Cleveland, OH, Orla E. Collier, John F. Stock, Benesch, Friedlander, Coplan & Aronoff, LLP, Columbus, OH, for plaintiffs.

John I. Houseal, Glankler Brown, PLLC, Charles W. Hill, Glankler Brown, PLLC, Jeffery A. Jarratt, Glankler Brown, PLLC. Larry Montgomery, Glankler Brown, PLLC, Earle J. Schwarz, Glankler Brown, PLLC, Memphis, TN, for defendant.

## ORDER DENYING PLAINTIFFS' MOTION TO STRIKE, GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

MAYS, District Judge.

On February 14, 2001, Plaintiffs filed a complaint bringing state law breach of contract claims and claims for breach of fiduciary duties prescribed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.* Defendant answered and counterclaimed for breach of contract under state law. This court has jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e).

Before the court are four pending motions. On May 6, 2003, Plaintiffs filed for summary judgment,[1] to which Defendant filed a response on September 2, 2003. Defendant filed for partial summary judgment on May 6, 2003, to which Plaintiffs filed a response on September 2, 2003. Defendant filed a motion for summary judgment on January 6, 2004, to which Plaintiffs filed a response on January 15, 2004, and Defendant filed a reply on February 4, 2004. On January 8, 2004 Plaintiffs filed a motion to strike Defendant's second motion for summary judgment to which Defendant filed a response of January 13, 2004. For the following reasons, Plaintiffs' motion to strike is DENIED. Plaintiffs' motion for summary judgment is GRANTED in part and DENIED in part. Defendant's motion for partial summary judgment is GRANTED in part and DENIED in part. Defendant's motion for summary judgment is DENIED.

## I. Background

The following facts are undisputed unless otherwise noted. Blue Cross and Blue Shield of Tennessee ("BCBST") is organized under Tennessee law and is authorized to do business in Tennessee as an insurance company. (Compl. at ¶ 7.) Guardsmark, Inc. ("Guardsmark") is a private security firm organized under the laws of the state of Delaware and headquartered in Memphis, Tennessee. (Pls.' Mot. for Summ. J. at 3; Compl. at ¶ 4.)[2] Guardsmark established the Guardsmark, Inc. Medical Plan (the "Plan"), a self-funded plan, to provide healthcare benefits to its approximately 18,000 employees. (Pls.' Mot. for Summ. J. at 3; Compl. at ¶ 4). The Board of Trustees of the Guardsmark, Inc. Medical Plan Trust Fund (the "Board") was established by Guardsmark to fund the Plan and to hold the Plan's assets. (Compl. at ¶ 6.) Guardsmark, the Plan, and the Board have instigated the instant suit, and the court will refer to them collectively as "Plaintiffs."

---

1. This motion was, in fact, a motion for partial summary judgment.

2. Cites to briefs are cites to the statements of undisputed facts contained in those briefs. Although the parties may have disputed certain aspects of these "undisputed" facts, the court has endeavored to determine which are truly undisputed. Cites to the complaint relate to jurisdictional facts. Although Defendant initially denied those facts in its answer for lack of information, following discovery Defendant has not denied the factual predicates of jurisdiction.

From 1984 until 1995, Memphis Hospital Service and Surgical Association, Inc. d/b/a Blue Cross and Blue Shield of Memphis served as the third-party administrator for the Plan. (Def.'s Mot. for Summ. J. at 3.) BCBST is the successor in interest to Memphis Hospital Service and Surgical Association, Inc. (Compl. at ¶ 8.)

In 1994, various healthcare providers under contract to Blue Cross and Blue Shield entities united in a national network known as the Blue Card Program to offer their customers access to preferred pricing agreements that had been negotiated by Blue Cross and Blue Shield entities. (Def.'s Mot. for Summ. J. at 3.) Within this program, a customer would contract with the local Blue Cross entity known as the home plan. (Pls.' Mot. for Summ. J. at 8.) The home plan negotiated preferred pricing agreements with local health care providers within its territory. (Pls.' Resp. to Def.'s Mot. for Summ. J. at 6–7.) For employees who incurred medical expenses outside the home plan's territory, the Blue Cross plan where the expenses were incurred, known as the host plan, would handle the employees' claims, thereby providing access to the preferred pricing agreements the host plan had negotiated with its local health care providers. (Id.) In exchange for this service, host plan Blue Cross programs would assess a percentage fee based on the amount their preferred pricing agreements saved the customer. (Pls.' Mot. for Summ. J. at Ex. A.) The home plan would then collect its fee, the host plan's fee, and the amount of the actual bill from the customer. (Id.) The home plan would then forward the host plan's fee and the actual bill amount to the host plan, which paid the provider's bill. (Def.'s Mot. for Summ. J. at 9.)

Some Blue Cross plans also negotiated agreements with local health care providers whereby those providers would rebate a percentage of the amount of the actual bill paid. (Pls.' Resp. to Def.'s Mot. for Summ. J. at 11.) When this practice came to light, a number of Blue Cross customers filed suit claiming that these refund agreements masked the true costs of the Blue Cross entities' services as costs for actual medical services.[3] The Secretary of Labor brought suit against BCBST in this court, and a consent decree was entered in 1994 requiring BCBST to reveal the details of any such arrangements to its customers and prospective customers. (Id. at 10–11.)

Guardsmark and BCBST executed an "Agreement to Provide Certain Administrative Services Only" (the "Agreement") on February 12, 1996. (Pls.' Mot. for Summ. J. at Ex. A.) The Agreement set forth the terms under which BCBST would provide Guardsmark access to the Blue Card Program in 1995 and 1996. (Id.) The Agreement also anticipated year-to-year renewals, but failed to provide a mechanism for determining fees or increases for years following 1996. (Id.) Clause 9 in the Agreement required that any amendments to the Agreement be made in writing upon agreement by the parties. (Id.) The Agreement, which was retroactively effective to July 1, 1995, stated that: (1) Guardsmark would pay a general administrative fee of $5.25 per employee per month; (2) Guardsmark would pay an administrative fee of $1.50 per employee per month for utilization review; (3) BCBST

---

**3.** Self-funded plans, like the one at issue here, are distinguishable from "insurance" plans. Self-funded plans themselves pay for the covered medical procedures of their employees. Entities such as BCBST are hired to administer the claims payment aspect of the plans and negotiate rates for services below those medical providers would ordinarily charge. When an employer buys an insurance policy, it pays for the policy itself and is not responsible for the individual claims under the policy. BLACK'S LAW DICTIONARY 802 (7th ed.1999) [hereinafter BLACK'S].

would retain any rebates it was able to negotiate with local providers. (Pls.' Mot. for Summ. J. at Ex. A.) The Agreement also stated that, effective July 1, 1996, the general administrative fee of $5.25 was to increase by five percent or the increase in the consumer price index, whichever was greater. (*Id.*) On April 25, 1996, BCBST informed Guardsmark that it would raise the general administrative fee by five percent on July 1, 1996. BCBST also attempted to raise the administrative fee for utilization review from $1.50 to $1.58 per person although the Agreement made no allowance for such an increase. (*Id.* at 4.) After Guardsmark objected to the latter increase, BCBST agreed to maintain the administrative fee for managed care services at $1.50 per employee per month. (*Id.*)

In December 1996, BCBST offered to provide Guardsmark employees with a prescription drug benefit for $1.00 per employee per month. (*Id.* at 5.) After negotiating a fee of 25¢ per employee per month, rather than a dollar, Guardsmark agreed to participate in the prescription drug program beginning March 1, 1997. (*Id.*) The parties never modified the Agreement in writing and never entered into a separate written agreement despite the clause requiring that any amendments be made in writing. (*Id.*)

In the summer of 1997, the parties had the option of allowing the Agreement to renew automatically for an additional year or giving thirty days notice of their intent to terminate the Agreement.[4] (*Id.* at Ex. A.) In a letter dated April 28, 1997, BCBST announced that it intended to raise the general administrative fee to $6.90 per employee per month while leaving the administrative rate for managed care at $1.50 per employee per month.

(*Id.* at 5.) Guardsmark objected to this increase and attempted to persuade BCBST to delay the implementation of the increase to January 1, 1998, after it became clear that BCBST intended to proceed with the increase. (*Id.*) BCBST refused to delay the implementation of the fee increase past July 1, 1997. (*Id.*) Although Guardsmark considered the increase invalid because of the written amendment clause, it began paying the new rates on July 1, 1997. Guardsmark, however, refused to sign a proposed amendment to the Agreement reflecting the increased rates that BCBST had announced in its April 28, 1997 letter. (Def.'s Mot. for Summ. J. at 5; Def.'s Mot. for Partial Summ. J. at 12.)

On May 21, 1998, BCBST sent Guardsmark a letter stating its intent to increase the fees again, effective July 1, 1998. (*Id.* at 6.) The general administrative fee would increase from $6.90 to $15.75 per employee per month and the managed care service fee would increase from $1.50 to $2.50 per employee per month. (Pls.' Resp. to Def.'s Mot. for Summ. J. at 8.) The letter also stated that BCBST would eliminate the 25¢ per employee per month charge for prescription drug benefits and institute a 20¢ credit per employee per month, in addition to passing on the local provider discounts that it had previously retained for itself. (Pls.' Mot. for Summ. J. at 6.) Finally, the letter detailed a new service offered by BCBST, the provision of HIPPA compliance for an administrative fee of 82¢ per employee per month. (*Id.*) BCBST portrays this as an optional service, (*id.*), but Guardsmark portrays it as the imposition of an additional fee, (Pls.' Resp. to Def.'s Mot. for Summ. J. at 8).

---

4. Although the Agreement states that it will automatically renew year to year, the parties agree that, after the first year, either party could terminate the agreement at any time by giving thirty days notice.

Guardsmark again objected to BCBST's decision to increase the fees under the Agreement. (*Id.* at 8–9.) BCBST agreed to extend the July 1, 1997 rates until August 1, 1998 so that the parties could meet to consider the increases. (*Id.* at 9.) The parties met on July 7, 1998. On August 7, 1998, BCBST announced that it would begin collecting a general administrative fee of $12.43 (rather than $15.75) per employee per month by September 1, 1998, but that the fee would increase to $20.32 beginning January 1, 1999. (*Id.*; Pls.' Mot. for Summ. J. at 8.) Guardsmark began paying the $12.43 fee on September 1, 1998. (Pls.' Mot. for Summ. J. at 8.)

Sometime in the summer of 1998, Guardsmark contracted with Coopers & Lybrand to review the market and present alternatives to continuing the Agreement with BCBST. (Pls.' Resp. to Def.'s Mot. for Summ. J. at 9.) By August 1999, Coopers & Lybrand had received proposals from other service providers, had analyzed those proposals and had recommended that Guardsmark replace BCBST with CIGNA.[5] (*Id.*; Def.'s Mot. for Summ. J. at 8.; Pls.' Resp. to Def.'s Mot. for Partial Summ. J. at 16.) Guardsmark rejected this recommendation, eventually selecting the Principal as the third-party administrator to replace BCBST. (Pls.' Resp. to Def.'s Mot. for Partial Summ. J. at 16.) On September 17, 1999, Guardsmark provided written notice to BCBST that it was terminating their relationship effective November 1, 1999. (*Id.*) The Principal, however, did not begin administering the plan until January 2000. (*Id.*)

The Agreement contained a three month run out provision under which BCBST would continue to process claims incurred prior to the termination date of November 1, 1999. (*Id.*) The run out provision does not specify a fee for this service, and Guardsmark interprets this absence to mean that no fee was required to obtain the service. (*Id.*) BCBST, however, proposed a charge of 15.8% of the amount of the in-area claims processed during the run out period. (*Id.*) When Guardsmark protested, BCBST lowered the fee to 14.5%. (*Id.*) Although still maintaining that any fee for this service violated the Agreement, Guardsmark paid the lower rate. (*Id.*) Guardsmark later discovered that BCBST had charged 14.5% of the in area and out of area claims paid, the out of area access fees, and the out of area administration fees, although the percentage fee was only to be calculated on in area claims paid. (*Id.*) When Guardsmark brought this to BCBST's attention, BCBST acknowledged the mistake and credited the $14,527.41 overpayment against the amount it had charged for the provision of services under the run out provision. (*Id.*)

Beyond the issue of what fees were proper under the Agreement, there are questions about whether BCBST performed adequately. When a claim was submitted, BCBST would determine which of six benefit groups the employee was in. (Pls.' Mot. for Summ. J. at Ex. B.) Applying the provisions of the applicable coverage group, BCBST would determine whether the claim was covered under the Plan. (C. Bregenzer Dep. Tr. 35–39, 54.) If BCBST determined that a claim was covered, it determined whether any subrogation options existed, whether another insurer might be liable for the same claim, and whether the employee had exceeded the employee's yearly or lifetime coverage limits under the Plan. (*Id.* at 41–42, 49–52, 58–59; S. Hardin Dep. Tr. 76–78.) BCBST maintained a two-level appeals

**5.** BCBST at one point states that the proposals had been reviewed and CIGNA had been identified as an alternative by August 1998.

The time line suggests that the actual date is August 1999, as listed in Guardsmark's briefs. The actual date, however, is not material.

process for employees who believed their claims had been wrongly denied. (S. Tritsch Dep. Tr. 29–31.) In some instances, employees would go directly to the Board, which retained the power to overrule BCBST's coverage decisions, although this redress was not part of the regular appeals process. (Def.'s Mot. for Summ. J. at 5; Pls.' Resp. to Def.'s Mot. for Partial Summ. J. at 11.) In certain other cases, Guardsmark directed BCBST to make "exceptions" in which BCBST was directed to pay claims regardless of coverage under the Plan. (Def.'s Mot. for Partial Summ. J. at 5–6.)

Once BCBST had determined the amounts for which the Plan was liable, it would inform Guardsmark of that amount. (J. Jacques Dep. Tr. 37–49.) The Plan maintained two bank accounts. (*Id.*) One was controlled by the Board and contained the bulk of the fund established to maintain the Plan and employee contributions to the Plan. (*Id.*) The other was a checking account over which BCBST exercised sole control (it possessed the only check stock). (*Id.* at 39.) Once a week, BCBST would inform Guardsmark that it intended to write a check the next day for a specific amount. (Def.'s Reply to Pls.' Resp. at 19.) Without verifying that the claims were properly payable under the Plan, Guardsmark would review BCBST's submission for mathematical errors and deposit sufficient funds into the checking account controlled by BCBST to insure that the check written by BCBST would clear. (J. Jacques Dep. Tr. 37–49.) BCBST would deposit the check written on the Guardsmark Plan account into one of its own accounts. (Def.'s Reply at 19.) BCBST would then write checks on its account to pay local service providers; BCBST also wrote checks to other Blue Cross plans for services provided non-locally. (J. Robeson Dep. Tr. 128–140.) Checks written on BCBST's account to local hospital providers were written daily. (*Id.* at 133.) Checks written to individual physicians, however, were sometimes not written for several days, allowing BCBST to collect interest on these amounts and on the amount of the float.[6] (*Id.* at 142–43.)

On January 1, 1999, BCBST implemented a new claims processing system known as "FACETS." (Pls.' Resp. to Def.'s Mot. for Summ, J. at 12.) During the transition period from the previous system, there were errors which at times caused BCBST to pay claims which were not in fact covered or owed by the Plan. (Def.'s Reply at 17–18.) The parties disagree as to whether these were isolated incidents soon corrected or overwhelming problems still costing the Plan money.

Plaintiffs allege that BCBST was incompetent in its administration of the Plan. Plaintiffs claim that BCBST failed to coordinate payments with other insurance companies which might have been liable for the same claims, failed to investigate the possibility of subrogation adequately, and failed to maintain records to determine when yearly and lifetime policy limits were met. Plaintiffs allege that these failings constituted a breach of BCBST's fiduciary duty to the Plan. BCBST denies that it had a fiduciary duty to the Plan and maintains that problems due to FACETS were limited and any losses minimal. Plaintiffs also claim that the billing errors breached either BCBST's fiduciary duty or the Agreement.

## II. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the

---

**6.** Float is "[t]he sum of money represented by outstanding or uncollected checks; the delay between a transaction and the withdrawal of funds to cover the transaction." BLACK'S 653.

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). So long as the movant has met its initial burden of "demonstrat[ing] the absence of a genuine issue of material fact," *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548, and the nonmoving party is unable to make such a showing, summary judgment is appropriate, *Emmons v. McLaughlin*, 874 F.2d 351, 353 (6th Cir. 1989). In considering a motion for summary judgment, "the evidence as well as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion." *Kochins v. Linden–Alimak, Inc.*, 799 F.2d 1128, 1133 (6th Cir.1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

When confronted with a properly-supported motion for summary judgment, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 250 (6th Cir.1998). A genuine issue of material fact exists for trial "if the evidence [presented by the nonmoving party] is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In essence, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505.

### III. The Motion to Strike

Plaintiffs have moved to strike BCBST's "second" motion for summary judgment, received December 31, 2003 and filed January 6, 2004. Plaintiffs argue that the motion was filed outside of the time period established for motions for summary judgment in the court's June 11, 2003 scheduling order and that they have been prejudiced by the delay in filing. The scheduling order states that amendments and supplementation of the pending motions for partial summary judgment (both filed May 6, 2003) were due August 15, 2003, with responses due September 2, 2003. The deadline for completing all expert discovery, however, was November 14, 2003. Thus, the court set a deadline of December 31, 2003, for filing potentially dispositive motions with responses due January 15, 2003.

BCBST's motion for summary judgment was timely. The scheduling order allowed the filing of such a motion. Additionally, Plaintiffs filed a response on January 15, 2004, addressing all of the issues raised in the motion for summary judgment. Plaintiffs have not been prejudiced by any confusion about the timing issue. The motion to strike is denied.

### IV. Fiduciary Status Under ERISA

Plaintiffs claim a right to sue under 29 U.S.C. § 1132(a)(2) and (a)(3) which provide:

(a) A civil action may be brought-

(1) . . .

(2) by the Secretary or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title;

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan;

Section 1109 of title 29 deals with liability for breach of fiduciary duty and states:

(a) Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. A fiduciary may also be removed for a violation of section 1111 of this title.

(b) No fiduciary shall be liable with respect to a breach of fiduciary duty under this subchapter if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary.

In seeking equitable relief under 29 U.S.C. § 1132(a)(3), Plaintiffs have alleged a violation of 29 U.S.C. § 1109.[7] By its terms, § 1109 applies only to fiduciaries. Plaintiffs argue that BCBST was a fiduciary of the Plan as to all the acts at issue in this case. BCBST argues that it was not a fiduciary of the Plan at all.

For ERISA purposes:

a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) . . ., or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). A person may be a named fiduciary or a functional fiduciary. A named fiduciary is a person explicitly named in the plan instrument as a fiduciary or one who can be identified as a fiduciary by a procedure specified in the plan, 29 U.S.C. § 1102(a)(2). A functional fiduciary, although not occupying a position of formal trusteeship, exercises control or authority over a plan which constitutes management or administration of the plan. *Seaway Food Town, Inc. v. Med. Mut. of Ohio,* 347 F.3d 610, 616–17 (6th Cir.2003). If the conduct at issue is merely a business decision that affects an ERISA plan, without constituting management or administration of the plan, the person's actions are not subject to fiduciary standards with respect to that conduct. *Id.* at 617. BCBST was not a named fiduciary of the Plan. Any fiduciary duties must arise because BCBST was a functional fiduciary.

### A. Fiduciary Status with Respect to Compensation

Plaintiffs argue that BCBST violated its fiduciary duty to the Plan by taking excess compensation for BCBST's services as third-party administrator. Therefore, the first level of inquiry is whether BCBST had a fiduciary duty to the Plan with respect to BCBST's own compensation.

■ First, Plaintiffs argue that, if BCBST was a fiduciary as to any of its conduct with respect to the Plan, BCBST was a fiduciary as to all of its conduct with respect to the Plan. Sixth Circuit law holds otherwise. *See Grindstaff v. Green,* 133 F.3d 416, 426 (6th Cir.1998) (under ERISA a person is a fiduciary only with respect to those aspects of the plan over which he or she exercises authority or control).

---

**7.** The parties dispute whether the complaint also seeks non-equitable relief in the form of money damages. The court addresses this issue below in Part V.A.

■ Second, Plaintiffs contend that BCBST had a specific fiduciary status with respect to compensation. In *Seaway, supra,* the defendant entered into a contract to serve as a claims administrator for plaintiff's employee health benefit plan. *Seaway,* 347 F.3d at 612. The plaintiff alleged that the defendant, which was a Blue Cross affiliate at the time, had violated its fiduciary duty by negotiating a clause allowing it to retain end-of-the-year provider rebates, and, thus, charging an unreasonable fee for its services. As discussed *infra* in Part IV.B, the actions of claims administrators in making coverage and payment decisions generally qualify them as fiduciaries with respect to that conduct. The *Seaway* court, however, looked to whether the defendant was acting as an ERISA fiduciary when negotiating compensation terms and held that it was not. *Id.* at 617–19. This holding was based on the court's finding that the defendant "did not exercise discretionary authority with respect to the setting of premium rates." *Id.* at 618. Where compensation levels are set through arms-length negotiations and where the compensation terms do not involve the exercise of discretion, a claims administrator is not an ERISA fiduciary with respect to negotiating its compensation levels. *Id.* at 619.

Plaintiffs have made several arguments based on BCBST's alleged breach of its fiduciary duties with respect to compensation negotiated under the contract. Compensation levels under the contract were set through arms-length negotiations.[8] One provision states the fees to be charged per employee per month. Another provision states that BCBST was entitled to retain certain credits/administrative fees received from providers as consideration for the administrator's service. Neither of these provisions allows BCBST to exercise discretion in determining the amount of compensation it receives. Therefore, BCBST was not an ERISA fiduciary with respect to compensation issues. ERISA does not apply to the compensation claims.

Because ERISA does not apply, there is no issue as to whether the compensation paid to BCBST were unreasonable, and therefore a breach of fiduciary duty. The non-applicability of ERISA, however, also means that Plaintiffs state law breach of contract claims are not pre-empted. *See Schulist v. Blue Cross & Blue Shield,* 717 F.2d 1127, 1128–29 (7th Cir.1983) (affirming district court decision that considered breach of contract claims after deciding that no ERISA fiduciary duties existed with respect to the relevant behavior) *cited with approval in Seaway,* 347 F.3d at 618. The court considers in Parts VI.C and VI.D below whether summary judgment should be granted on the breach of contract claims.

**B. Fiduciary Status with Respect to Claims Administration Functions**

■ Plaintiffs claim that BCBST breached its fiduciary duty to the Plan by incompetently performing its claims administration functions. BCBST responds that it had no discretionary authority or control over Plan management or administration and did not exercise authority or control over the disposition of Plan assets.

"When an insurance company administers claims for an employee welfare benefit plan and has authority to grant or deny the claims, the company is an ERISA 'fiduciary' under 29 U.S.C. § 1002(21)(A)(iii)." *Libbey–Owens–Ford Co. v. Blue Cross & Blue Shield Mut. of Ohio,* 982 F.2d 1031, 1035 (6th Cir.1993).

---

8. The court recognizes that Plaintiffs claim certain fees were "imposed" rather than negotiated. The court addresses that argument below in Part VI.C.

An administrator is a fiduciary whether claims administration is conducted for an insured plan or a self-insured plan. *Id.* BCBST admits that it had authority to grant or deny claims, but still maintains that it was not a fiduciary. First, BCBST argues that its role was merely ministerial, that it simply applied the provisions set forth in the self-insured Plan and, thus, had no discretion to grant or deny claims. *Libbey–Owens* implicitly rejected this argument when the court concluded that authority to grant or deny claims under a self-insured plan makes one a fiduciary. Although BCBST may be bound by the provisions for coverage under the Plan, those provisions are not so detailed as to be the equivalent of a mathematical equation. Reasonable people applying the provisions, and considering the same information, could reach different conclusions. The process is not so lacking in discretion as to be purely ministerial. *See Flacche v. Sun Life Assur. Co. of Canada (U.S.),* 958 F.2d 730, 734 (6th Cir.1992) (including interpretation of policies as a non-ministerial function).

Second, BCBST argues that, although it might have had preliminary authority to grant or deny claims, it did not have final authority to grant or deny claims. BCBST would decide whether a claim was covered under the Plan, then grant or deny that claim. Employees who disagreed with BCBST's initial decision could appeal the decision to a BCBST panel. If that appeal failed, the decision could be appealed to a second BCBST panel. Although a denial of the second appeal usually ended the process, a small number of employees did take their appeals directly to the Board, which could then direct BCBST to pay the claim. On several occasions, the Board also directed BCBST to pay a claim before BCBST had actually processed the claim to determine whether the claim was covered. The Board, however, never overruled a BCBST grant of a claim. Under these circumstances, the argument that BCBST did not function as a fiduciary is unpersuasive. The court must look to the reality of the situation in determining whether a person is an ERISA fiduciary. *See Seaway,* 347 F.3d at 616–17 (courts must look to actual control or authority rather than formal trusteeship); *Smith v. Provident Bank,* 170 F.3d 609, 613 (6th Cir.1999) (discretionary authority or discretionary control is the determinant). The claims of the overwhelming majority of Guardsmark employees for medical benefits were granted or denied by BCBST. All grants of benefits were final under this system. No established system existed to appeal a denial of a claim to the Board. To say that BCBST did not function as a fiduciary in this situation would be to deny the reality of BCBST's role in the process.

BCBST's alleged incompetence in administering the Plan is properly addressed as a breach of fiduciary duty under ERISA. The court addresses whether summary judgment is appropriate under ERISA in Part V below.

## C. Fiduciary Status with Respect to the Checking Account

■ Plaintiffs allege that BCBST acted as a fiduciary with respect to the checking account. The Plan maintained two checking accounts, one of which was controlled exclusively by BCBST, which possessed the check stock. When a person is authorized to draw checks on a plan's account, that person necessarily exercises control over the disposition of plan assets. *See* 29 U.S.C. § 1002(21)(A)(i); *IT Corp. v. Gen. Am. Life Ins. Co.,* 107 F.3d 1415, 1421 (9th Cir.1997). BCBST argues that it did not have effective control over the disposition of Plan assets because a low balance was maintained in the account it controlled. Deposits were made only in response to BCBST's notices of the amounts to be drawn on the account the next day, and

the resulting checks reduced the account balance to a nominal amount.

On this record BCBST maintained sufficient control to qualify as a fiduciary. The case law makes no distinction based on the balances normally maintained in an account. Additionally, because Plaintiffs checked BCBST's notices only for mathematical errors before transferring funds to the account controlled by BCBST, BCBST had effective access to the funds in the larger account. Its check writing authority makes BCBST a fiduciary.

■ The only alleged breach of fiduciary duty with respect to the checking account was BCBST's retention of interest on the float and on delayed payments to individual physicians. Plaintiffs allege that BCBST's retention of that interest violates 29 U.S.C. § 1106(a)(1)(A) barring a plan fiduciary from causing the plan to sell, lease, or exchange property with a party in interest.[9] Other courts which have addressed the issue, however, consider the retention of interest on float to be an issue of compensation, where it is clear that float will be created. *See Assocs. in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.*, 941 F.2d 561, 564, 568–69 (holding that where it was clear up to seven days of float might exist, interest on float was contracted for compensation); *Sirna v. Prudential Securities, Inc.*, 964 F.Supp. 147, 150 (S.D.N.Y.1997) (holding that interest on float is part of compensation). Here, the only checks that BCBST drew on the Plan checking account were to itself. All individual checks were written on BCBST's own account. This was the course of events anticipated by the parties. Because it was clear that the transaction would be structured in this way and that BCBST would be retaining the interest on

float, that interest is an element of compensation and BCBST is not a fiduciary with respect to it. *See Sirna*, 964 F.Supp. at 150. Summary judgment is granted to Defendant as to those parts of Plaintiffs' claims dealing with float.

A similar analysis applies to the interest retained on delayed payments to the individual physicians. On the day before withdrawal, BCBST sent Plaintiffs a weekly notice of the amount it would be withdrawing from the Plan checking account. Plaintiffs knew that BCBST would then write itself a check for the entire amount deposited, funds sufficient to cover all claims to be paid that week, rather than writing itself a check each day to cover the claims to be paid that day. For the same reason that interest on float should be analyzed as negotiated compensation, the interest on these "delayed" payments should also be treated as negotiated compensation. Plaintiffs knew or should have known that the funds from the weekly check BCBST wrote on the Plan account would remain in BCBST's account until claims were paid by checks written on BCBST's account over the course of the following week. Thus, BCBST did not breach any fiduciary duties in retaining this interest. BCBST did not sell, lease or exchange Plan property with a party in interest as a violation of 29 U.S.C. § 1106(a)(1)(A) would require. Summary judgment is granted as to claims that BCBST breached any fiduciary duty by retaining the interest on these amounts.

## V. The ERISA Claims

### A. Incompetent Claims Administration

As the court noted above, BCBST is a fiduciary with respect to claims adminis-

---

9. The better argument would be that the retention of interest on float violates either 29 U.S.C. § 1106(a)(1)(B), which bars the direct or indirect lending of money or extension of

credit to a party in interest, or § 1106(b)(1), which bars fiduciaries from dealing with the assets of a plan in their own interest. Plaintiffs do not make either of these arguments.

tration. The parties have submitted evidence about whether BCBST incompetently administered the Plan and, thus, breached its fiduciary duty. Whether BCBST was in fact incompetent and, if so, how much this incompetence cost the Plan are issues of fact not appropriate for summary judgment. Defendant, however, has raised several defenses which may be decided on summary judgment.

First, BCBST argues that the complaint does not seek compensatory damages, only equitable damages. The complaint, however, states that "Plaintiffs are, therefore, entitled to compensatory damages from BCBST based on ... 29 U.S.C. § 1132(a)(3), which authorizes appropriate equitable relief for the purpose of redressing any violations or enforcing any provisions of an ERISA plan." BCBST treats this seeming discrepancy as a request for equitable restitution and cites a number of recent cases limiting recovery to cases where the actual funds at issue can be identified. *See Great–West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 214, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002). The complaint, however, put BCBST on notice that Plaintiffs were seeking compensatory damages and identified the law on which they relied. In the complaint, Plaintiffs claimed a right to sue under 29 U.S.C. § 1132(a)(2) for violations of 29 U.S.C. § 1109. Section 1109 permits the recovery of money damages. Thus, the complaint taken as a whole put BCBST on notice that Plaintiffs sought compensatory damages. This satisfies the requirements of notice pleading, and the court will not grant BCBST summary judgment on the ground that the complaint did not seek non-equitable compensatory damages. *Cf. Anderson v. Randstad Staffing Servs. Inc.,* 2003 WL 21920925, at *4 (E.D.Tenn. June 19, 2003) (refusing to dismiss age discrimination case brought under Title VII rather than ADEA where it had been apparent at all times that plaintiff intended to pursue an age discrimination suit under federal law).

■■ Next, BCBST maintains that its alleged incompetence in administering the plan is not a breach of fiduciary duty because BCBST did not benefit from any breaches and the beneficiaries were not harmed. Under 29 U.S.C. § 1104, a fiduciary's actions are evaluated using the prudent man standard. A fiduciary must discharge its duties solely in the interest of beneficiaries (1) for the exclusive purpose of providing benefits and defraying reasonable administration cost, (2) with the care, skill, prudence, and diligence that a prudent man acting in like capacity and familiar with such matters would use, (3) ..., (4) in accordance with the documents and instruments governing the plan. 29 U.S.C. § 1104(a)(1).[10] BCBST argues that, because it did not engage in self-dealing and did not benefit from its alleged incompetence, it satisfies the first criterion of acting exclusively for the benefit of plan beneficiaries. Although the latter does not necessarily follow from the former, BCBST's argument is ultimately irrelevant. It is clear that, if Plaintiffs' allegations prove true, BCBST did not act with the skill, prudence and diligence of a pru-

---

10. Although BCBST cites the court to 29 U.S.C. § 1104 for fiduciary duties, it also notes that "[i]t could be argued that the prudent man rule applies only to fiduciaries who are responsible for investing plan assets." That argument would be inconsistent with the case law dealing with this provision. *See UNUM Life Ins. Co. of Am. v. Ward,* 526 U.S. 358, 375–76, 119 S.Ct. 1380, 143 L.Ed.2d 462 (1999) (applying 29 U.S.C. § 1104(a)(1)(D) to an insurance contract); *Hamilton v. Allen–Bradley Co., Inc.,* 244 F.3d 819, 825 (11th Cir.2001) (applying 29 U.S.C. § 1104's prudent man standard to a disability insurance case).

dent man and did not act in compliance with Plan documents.

BCBST, however, urges the court to look to the real purpose of ERISA, the protection of plan beneficiaries. BCBST argues that, at worst, its alleged incompetence harmed the Plan but not the Plan beneficiaries. According to BCBST, because Guardsmark operated a self-funded plan, Guardsmark, rather than Plan beneficiaries, lost money. In fact, BCBST argues, Plan beneficiaries might have benefited from the alleged errors involving payment of bills after annual or lifetime benefit caps had been met. BCBST wants the court to treat any incompetence as a simple breach of contract issue. That approach is untenable. First, Guardsmark does not possess such an unlimited supply of money that BCBST can waste Plan assets without affecting the benefits available to beneficiaries. Second, Plan beneficiaries made contributions to the Plan, and a waste of Plan assets does harm them. Third, Congress has decided the duties of fiduciaries under 29 U.S.C. § 1104. Those duties include acting with the care, skill, prudence and diligence of a prudent man and acting in accordance with plan documents and instruments. It is not the court's place to excuse BCBST from duties imposed by Congress, and BCBST has cited no cases to the contrary.

Issues of material fact exist, and neither side is entitled to summary judgment on this issue.

### B. Injunctive Relief

Count II of the complaint seeks an injunction barring BCBST from acting as an ERISA fiduciary for any plan. BCBST, although acknowledging that such a remedy exists, argues that the facts of this case

do not warrant the remedy, which would effectively put BCBST out of business. The remedy sought is an extreme one. The court will not, however, determine remedies before establishing the facts. Many of the relevant facts of this case can only be determined at trial. Defendant's motion for summary judgment as to Count II is denied.

## VI. Tennessee Contract Law

### A. Choice of Law

A federal district court is required to apply the "choice of law" rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Cole v. Mileti*, 133 F.3d 433, 437 (6th Cir.1998). "Otherwise the accident of diversity of citizenship would constantly disturb equal administration of justice in coordinate state and federal courts sitting side by side." *Klaxon*, 313 U.S. at 496, 61 S.Ct. 1020. Therefore, this court must apply the Tennessee rule to determine which jurisdiction's law to apply.

Section 8 of the Agreement provides that Tennessee law governs Plaintiffs' [11] contract claims. Tennessee will honor a choice of law clause if the state whose law is chosen bears a reasonable relation to the transaction, absent a violation of the forum state's public policy. *Bright v. Spaghetti Warehouse, Inc.*, 1998 WL 205757, at *5 (Tenn.Ct.App. Apr.29, 1998); *Arcata Graphics Co. v. Heidelberg Harris, Inc.*, 874 S.W.2d 15, 27 (Tenn.Ct.App.1993). Guardsmark has its headquarters in Memphis, Tennessee. BCBST is a Tennessee corporation and is authorized to do business in Tennessee as an insurance company. Tennessee law, therefore, bears a rea-

---

11. Guardsmark signed the Agreement on behalf of itself and the Plan. The Board is not a party to the Agreement and may not sue for breach. The court will continue referring to

"Plaintiffs" with the understanding that it is referring only to Guardsmark and the Plan with this designation in Part VI.

sonable relation to the transaction, and the court will apply Tennessee law in considering the breach of contract claims.

### B. Disclosure of Rebates Provision

 Under Clause 6 of the Agreement, BCBST is entitled to retain credits/administrative fees that it receives from providers as a form of compensation. That clause also provides that BCBST will provide Guardsmark with "all such documents and other information sufficient to enable the Benefit Plan to determine the method or methods by which the administration fees and credits or discounts will be calculated under th[e] Agreement." That disclosure is also required under the consent decree between the Secretary of Labor and BCBST in 1994.

Plaintiffs claim in their motion for partial summary judgment that "Plaintiffs were unaware that the Plan was funding . . . contractual settlements and that their claim dollars would or could be recharacterized to Blue Cross as increased revenue." This contention is at odds with the language in the Agreement that states "Administrator [BCBST] has advised Employer [Guardsmark] that Administrator receives certain credits/administrative fees as consideration for Administrator's services to providers with whom the Administrator contracts. . . . Administrator shall retain such credits/administrative fees as consideration for Administrator's services . . . ." As to rates charged by the host plans, the Agreement states that a "Host Plan may report to Administrator provider payments in amounts other than the actual payment where the Host Plan has averaged its discounts/differentials in determining the amount to be billed . . . ."

The only question remaining, then, is whether BCBST provided the documents and information required by the Agreement. Plaintiffs have alleged that the required documents and information were not provided and that this failure violates both the Agreement and the 1994 consent decree with the Secretary of Labor. Plaintiffs seem to make two alternative arguments. First, they argue that BCBST was required to provide them with information about any rebates host plan Blue Cross providers received for procedures paid for by the Plan. The Agreement, however, does not promise Plaintiffs access to any records other than those of BCBST. The 1994 consent decree does not require BCBST to provide non-BCBST documents or information.

Second, Plaintiffs argue that BCBST did not provide them with BCBST's internal documents, which would have indicated the amounts of any discounts BCBST retained. Thus, Plaintiffs allegedly were unable to determine BCBST's true compensation levels. Both the Agreement and the consent decree require such disclosures. BCBST argues that it provided internal documents. Plaintiffs deny receiving adequate documentation. The truth of this matter cannot be determined on summary judgment and presents an issue of material fact appropriate for trial.

### C. Fee Increases

 The Agreement was retroactively effective on July 1, 1995. Although the Agreement provides for automatic renewal each year, it does not provide a method for determining fees after the first two years. The Agreement also allows either party to terminate at any time after the first year by giving thirty-days notice. Approximately two months before the Agreement was to renew automatically in 1997, BCBST sent Plaintiffs the terms under which it was willing to continue providing its services. Slightly more than a month before the Agreement was to be renewed in 1998, a similar process occurred.

Plaintiffs do not contend the Agreement contemplated that fees for BCBST's services would remain at 1996 levels or that the fee calculation method established for 1996 was intended to apply to subsequent years. Instead, Plaintiffs argue that fees had to be set through agreement and that the written amendment clause required that any fee increases be reduced to writing. Thus, Plaintiffs argue that BCBST breached the Agreement when it unilaterally imposed fee increases and that the Plan is entitled to a refund of all fees paid in excess of what the Agreement provided in 1996.

There are a number of problems with Plaintiffs' arguments. First is the contention that the parties did not agree to the fee increases beginning in 1997. The facts do not support this contention. The fees to be charged under the Agreement were set through July 1, 1997. Several months before the Agreement was to renew automatically in both 1997 and 1998, BCBST communicated the terms under which it was willing to continue the relationship. Plaintiffs objected to both fee increases. In 1998, Plaintiffs were successful in convincing BCBST to alter the fees to be charged and the effective dates of the increases, although Plaintiffs still believed the fees being charged were too high. From July 1, 1997 until the agreement terminated in late 1999, Plaintiffs paid the higher fees submitted by BCBST. Plaintiffs argue that they never agreed to pay these fees and that, when BCBST sent a written amendment for them to sign, they refused to sign it.

Black's Law Dictionary defines an agreement as "[a] mutual understanding between two or more persons about their relative rights and duties regarding past or future performances; a manifestation of mutual assent by two or more persons." BLACK'S 67. Plaintiffs understood that, if the Agreement were renewed for an additional year, they would have a duty to pay the increased fees; in return, Plaintiffs received the right to BCBST's services. Plaintiffs manifested assent to this arrangement when they began paying the higher fee. *Cf. Kantor v. Memphis Plaza Hotel Partners, Ltd.-I*, 1987 WL 15525, at *1–2 (Tenn.Ct.App. Aug.13, 1987) (holding that agreement had been reached where the plaintiff had proposed terms for providing his services to the defendant and the parties then entered into a business relationship—despite defendant's claim it never agreed to the plaintiff's proposed salary terms for that relationship). The fact that the amount of the fee increases were decided unilaterally[12] or that BCBST's offer for continued service was made on a "take it or leave it basis" does not mean that Plaintiffs did not agree to those increases.

Next, Plaintiffs argue that BCBST should be forced to refund the fee increases because the Agreement requires that any amendments be in writing. When BCBST sent proposed amendments to Guardsmark reflecting the terms for renewal, Guardsmark refused to sign them. Guardsmark's briefs make clear that its goal was to avoid indicating agreement to the fee increases and to preserve a legal argument for a refund based on the absence of a written amendment to the Agreement. Plaintiffs are equitably estopped from making this argument, as discussed below. *See R.J. Betterton Mgmt. Servs., Inc. v. Whittemore*, 769 S.W.2d 214, 215–16 (Tenn.Ct.App.1988) (holding that, where one party had received a written

---

**12.** The facts do not support the contention that the 1998 increases were unilateral. Through negotiations, Plaintiffs convinced BCBST to institute a lower percentage increase than originally planned and to delay the increase past the renewal date (when past increases had been implemented).

agreement and conformed his conduct to that agreement for an extended period of time, but failed to sign the agreement, he was equitably estopped from denying the validity of the agreement). Also, the Agreement provides that "[t]his agreement may be amended only in writing, by the agreement of the parties." The Agreement does not require that amendments be signed. *See T.R. Mills Contractors, Inc. v. WRH Enters., LLC,* 93 S.W.3d 861, 865–66 (Tenn.Ct.App.2002) (a written agreement does not have to be signed to be binding). BCBST memorialized the terms in writing and sent the proposed written amendment to Plaintiffs. Plaintiffs paid the amounts specified by the proposed written amendment but refused to sign it. The two requisites of amendment under the Agreement were met: written terms and the agreement of the parties to amend. *See id.* (holding that, when a contract is signed by one party but not the other, the manifestation of consent by the non-signing party is sufficient to bind that party). Although a signed writing is a superior way of memorializing an agreement, Plaintiffs' paying the amounts specified by the proposed written amendments for two and a half years clearly shows that they did agree to the terms in the proposed written amendment.[13] *Id.* (demonstrating mutual assent is the critical factor).

▪▪▪▪ Finally, Plaintiffs are equitably estopped from arguing that they did not agree to pay the increased fees. In Tennessee:

[t]he essential elements of an equitable estoppel as related to the party estopped are said to be (1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) Intention, or at least expectation that such conduct shall be acted upon by the other party; (3) Knowledge, actual or constructive of the real facts. As related to the party claiming the estoppel they are (1) Lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) Reliance upon the conduct of the party estopped; and (3) Action based thereon of such character as to change his position prejudicially.

*Robinson v. Tennessee Farmers Mut. Ins. Co.,* 857 S.W.2d 559, 563 (Tenn.Ct.App. 1993) (citations omitted). The burden is on the party claiming estoppel to show all the elements are present. *Id.* To the extent that Plaintiffs argue they had no agreement, by their conduct: (1) Plaintiffs sought to convey the impression that they had agreed to the fee increases when in fact they had not; (2) Plaintiffs intended BCBST to act on this conduct by not terminating the Agreement as it was entitled to do; and (3) Plaintiffs knew that they did not intend to agree to the fee increases. As to the Defendant: (1) BCBST lacked knowledge of Plaintiffs' rejection of the fee increases because Plaintiffs paid the increased price; (2) BCBST relied on this conduct by not terminating the Agreement as it was contractually entitled to do; and (3) BCBST changed its position in that it provided services which would not have been forthcoming had the truth been known. These facts are sufficient to equitably estop Plaintiffs from maintaining an action for the return of the "excess" fees.

---

**13.** Tennessee Code Annotated § 47–50–112 does not require a different outcome. That section only mandates the enforcement of contract provisions requiring waivers to be in writing. Here, Guardsmark's conduct is not being considered as a waiver of a contractual term, but instead as an agreement to contractual terms requiring assent.

Plaintiffs maintain that BCBST cannot establish that Plaintiffs' conduct was voluntary. Equitable estoppel bars a party where his or her voluntary conduct absolutely precludes asserting a right. *Whittemore,* 769 S.W.2d at 216. Plaintiffs assert that they were acting under duress and that their conduct in acquiescing to the fee increases was involuntary. This alleged duress resulted because BCBST only gave notice of its proposed fees for the coming year six to eight weeks before the Agreement was to be renewed. Guardsmark claims that a company of its size and number of employees would take close to a year to find an alternative administrator.[14] Because Guardsmark was obligated to provide health benefits to its employees, it claims it had no choice but to pay the increased fees, that "it was like if you have a gun to your head." (R. Overman Dep. Tr. 149–50.)

Plaintiffs' argument ignores the reality of the relationship the Agreement established between Plaintiffs and Defendant. Plaintiffs' argument that its agreement to pay the higher fees was involuntary turns on the fact that it could not find an alternative administrator in less than a year and, therefore, had to accept whatever terms BCBST offered. BCBST, however, was not obligated to provide its services to Guardsmark after July 1, 1996 at all. At any point thereafter, BCBST could have stopped administering the Plan thirty days after giving notice. BCBST's rate proposals for the following year always came more than thirty days before the contract was to be renewed, thereby giving Guardsmark more time to prepare than did the terms of the Agreement itself.

Further, Guardsmark's actions belie the contention that it acted involuntarily in paying the increased fees. The first increase was announced in April 1997 and implemented in July 1997. The second increase was announced in May 1998, over a year after the first increase had been announced. It was not until this point that Guardsmark began to consider an alternative administrator. Thus, although it had sufficient time to find an another administrator before the second increase, Guardsmark did not do so, despite claiming that it paid the increased fees in 1997 only because BCBST had announced the fee increases so late. Later, when Guardsmark decided to replace BCBST as administrator, Guardsmark rejected CIGNA, which its consultant had recommended, instead choosing the Principal, which could not begin providing service for another six months. Again, Guardsmark failed to take the path which would have severed its relationship with BCBST, instead choosing to pay the increased fees for another six months.

The facts indicate that Guardsmark's payment of higher fees after July 1, 1997 did not result from duress. The higher fees resulted from Guardsmark's failure to protect itself contractually (by mandating that fee terms for the following renewal period be proposed a year in advance after 1996) or to research its options sufficiently in advance of the renewal date. BCBST has a right to determine what price it will charge for its services. *See Ross Meehan Foundries v. Nashville Bridge Co.,* 149 Tenn. 693, 261 S.W. 674, 677 (1924) ("A dealer has a right to set a price on his wares, and when a purchaser, with knowledge of such price, takes and appropriates the article, he must pay that price.") The Agreement limited BCBST's right by setting fees for 1995 and the maximum percentage those fees could be increased for

---

14. In fact, when Guardsmark decided to find a different administrator, it did take approximately one year.

1996. After 1996, BCBST could charge what it wanted.[15] By agreeing to the fee increases, Guardsmark acted to prevent BCBST from exercising its contractual right to end the relationship in thirty days.[16] Guardsmark's payments were not involuntary.

None of BCBST's actions as to the 1997 and 1998 fee increases breached the Agreement. When BCBST announced its increased fees, Guardsmark had four options: (1) it could agree to the fees and continue the relationship; (2) it could attempt to negotiate different terms and continue the relationship; (3) it could give thirty days notice and end the relationship itself; or (4) it could reject the increase and allow BCBST to end the relationship by giving thirty days notice. Inducing BCBST to continue providing services for an additional two and a half years by paying the increased fees while attempting to create a basis for later recovery of the increases paid was not a valid option.

## D. Run Out Services Fee

■ The Agreement provides:

Administrator agrees to provide the out-of-area services contained herein .... In the event of cancellation of this Agreement, the Administrator agrees to provide the continuation of claims administration for claims incurred prior to the cancellation date for a period of three months and the Plan agrees to continue to be responsible for the administrative fees and claims payable during said period.

After the cancellation of the Agreement, BCBST announced that, in addition to the administrative fees and claims payable amounts for out-of-area services, which BCBST simply passes through to host plans, it would also charge a fee of 15.8% on the in-area service claims paid. No provision in the Agreement indicates that an additional fee can be charged for this service. BCBST breached the Agreement in demanding a second fee to provide services it had already contractually agreed to supply at no additional cost.

■ BCBST argues that Plaintiffs are equitably estopped from making the argument that the fee was contractually barred. BCBST, however, cannot establish all of the necessary elements of estoppel. Specifically, BCBST did not change its position prejudicially in reliance on Plaintiffs' conduct. Under the Agreement, BCBST was bound to provide three months of run out service. BCBST was not entitled to an additional fee for this service. Therefore, BCBST's provision of these services did not prejudice it.

■ BCBST also claims that there was an accord and satisfaction barring Plaintiffs from arguing that the fees charged for run out services are contractually invalid. In Tennessee:

To constitute a valid accord and satisfaction it is also essential that what is given or agreed to be performed shall be offered as a satisfaction and extinction of the original demand; that the debtor shall intend it as a satisfaction of such

---

**15.** There may be an argument that BCBST was required to act in good faith in proposing fee increases. Plaintiffs, however, have not made that argument. The only explanation for the increases in the record indicates BCBST's higher fees were needed to cover its increasing costs, which would negate any claim of bad faith.

**16.** *Duffy Tool & Stamping, Inc. v. Bosch Automotive Motor Systems Corp.*, 2000 WL 122225 (Tenn.Ct.App. Feb.1, 2000), cited by the Plaintiffs, is inapposite. There, the defendant attempted to extract a price increase after the first year of a three-year contract. Here, Defendant announced that it was increasing its fees and that, if Plaintiffs would not pay the fees, Defendant would exercise its contractual right to terminate the Agreement.

obligation, and that such intention shall be made known to the creditor in some unmistakable manner. It is equally essential that the creditor shall have accepted it with the intention that it should operate as a satisfaction. Both the giving and the acceptance in satisfaction are essential elements, and if they be lacking there can be no accord and satisfaction. The intention of the parties, which is of course controlling, must be determined from all the circumstances attending the transaction.

*Ward v. Wilkinson*, 1999 WL 221843, at *2 (Tenn.Ct.App. April 19, 1999). After Plaintiffs began paying the run out services fee, they realized that BCBST was charging the fee on amounts that, under BCBST's own proposal, were not subject to the fee. When Plaintiffs brought this to BCBST's attention, BCBST agreed that the fee should not have been charged and credited the amount of the overpayments against the amount still "owed" for run out services. It is clear that what Plaintiffs expected when they pointed out this error was a refund not a credit. They were not seeking to extinguish another debt but to get their money back. BCBST's unilateral act of crediting the amount sought against another debt owed cannot constitute an accord and satisfaction. The essential element of the debtor's intentionally giving something in satisfaction is lacking.

Plaintiffs are granted summary judgment on this issue, including those parts of Defendant's counterclaim which seek payment of this contractually unauthorized fee.

## VII. Conclusion

For the foregoing reasons, the court DENIES Plaintiffs' motion to strike. Defendant's motion for partial summary judgment is GRANTED as to the issue of fee increases, float interest, and interest on delayed payments, but DENIED as to the remaining issues. Defendant's motion for summary judgment is DENIED. Plaintiffs' motion for summary judgment is GRANTED as to the issue of run out fees, and DENIED as to the remaining issues.