RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0376P (6th Cir.)
File Name: 03a0376p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

SEAWAY FOOD TOWN, INC.
*Plaintiff-Appellant,*

*v.*

No. 01-4285

MEDICAL MUTUAL OF OHIO,
*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 98-07576—James G. Carr, District Judge.

Argued: May 1, 2003

Decided and Filed: October 23, 2003

Before: CLAY and GIBBONS, Circuit Judges;
CLELAND, District Judge.[*]

---

[*] The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

---

## COUNSEL

**ARGUED:** Anastasia Kay Hanson, SPENGLER NATHANSON, P.L.L., Toledo, Ohio, for Appellant. James D. Thomas, SQUIRE, SANDERS & DEMPSEY, Cleveland, Ohio, for Appellee. **ON BRIEF:** Anastasia Kay Hanson, Lisa E. Pizza, Theodore M. Rowen, SPENGLER NATHANSON, P.L.L., Toledo, Ohio, for Appellant. James D. Thomas, Christopher R. Shea, SQUIRE, SANDERS & DEMPSEY, Cleveland, Ohio, for Appellee.

---

## OPINION

---

CLAY, Circuit Judge. Plaintiff, Seaway Food Town, Inc. ("Seaway"), filed suit against Defendant, Medical Mutual of Ohio ("Medical Mutual"), formerly known as Blue Cross & Blue Shield Mutual of Ohio ("BC/BS"), alleging that BC/BS breached its fiduciary duties to Seaway in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1001-1461. Seaway appeals from the district court's order entered on October 10, 2001, granting Medical Mutual's motion for summary judgment and denying Seaway's motion for summary judgment. For the reasons set forth below, we **AFFIRM** the district court's order.

## STATEMENT OF FACTS

### *Procedural History*

On September 28, 1998, Seaway filed a complaint against Medical Mutual alleging that BC/BS breached its fiduciary duties with respect to its administration of Seaway's employee health benefit plan ("plan") in violation of ERISA. Specifically, Seaway alleges that BC/BS breached its fiduciary duties to Seaway by failing to (1) use accurate data to estimate the amount of discounts (hereafter referred to as "provider discounts"[1]) BC/BS expected to receive from healthcare providers, (2) disclose the true nature and extent of the provider discounts it actually received, and (3) pass along to Seaway the provider discounts it actually received. Seaway also alleged Ohio common law claims of breach of contract and conversion. Seaway sought various relief, including restitution in the amount of provider discounts retained by BC/BS.

Medical Mutual filed an answer to the complaint on November 20, 1998. In its answer, Medical Mutual counterclaimed for contribution and indemnification of any judgment rendered against it and for attorney's fees and costs incurred in defending the suit. Seaway filed an answer to the counterclaims on December 1, 1998.

Both Medical Mutual and Seaway filed motions for summary judgment on June 1, 2001 and June 26, 2001, respectively. Medical Mutual argued that unambiguous terms contained in a series of contracts governing BC/BS and Seaway's relationship authorized BC/BS to retain any funds

---

[1]When providers join the health benefit plan, they agree to accept discounted fees in lieu of payment in full. *See, e.g., HCA Health Servs. of Georgia, Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 987 (11th Cir. 2001).

resulting from the provider discounts, and that BC/BS did not owe any fiduciary duties to Seaway during negotiations for the contract terms. Seaway, on the other hand, argued that the contract terms were ambiguous, and that, because BC/BS was administering Seaway's plan, BC/BS owed fiduciary duties to Seaway throughout their contractual relationship. The district court conducted a hearing on the parties' motions for summary judgment on September 20, 2001.

By order issued on October 10, 2001, the district court granted Medical Mutual's motion for summary judgment and denied Seaway's motion for summary judgment. The district court held that BC/BS did not act as an ERISA fiduciary during negotiations with Seaway and that unambiguous contract terms authorized BC/BS to retain any funds resulting from the provider discounts for its sole benefit. The district court therefore concluded that Seaway was not entitled to a pass-through of actual provider discounts. The district court also held that Seaway's state law claims were preempted by ERISA. On November 7, 2001, Seaway filed a notice of appeal, contesting the ruling that BC/BS did not act as an ERISA fiduciary.

### *Substantive History*

#### A.　The Parties

Seaway is an Ohio corporation with its principal place of business in Maumee, Ohio. From 1990 to 1995, Seaway employed approximately 4000 employees and operated approximately sixty supermarkets throughout Michigan and Ohio.

Medical Mutual is an Ohio mutual organization with its principal place of business in Cleveland, Ohio. Medical Mutual is the successor to BC/BS. From 1991 to 1998, BC/BS served as an administrator of Seaway's plan pursuant to a series of contracts.

### B.   Seaway's Selection of BC/BS

In 1990, Seaway began searching for a new claims administrator for its employee health benefit plan for the coming year.  To assist in the search, Seaway employed Findley, Davies and Company ("FDC"), a health benefits consulting firm headquartered in Toledo, Ohio.  FDC, on behalf of Seaway, solicited health maintenance organization plan proposals and traditional indemnity plan proposals from six companies, including BC/BS.  After receiving the proposals, FDC prepared a written report in which it analyzed the financial aspects of each company's proposal and recommended that Seaway give further consideration to the companies that submitted the most competitive proposals. FDC presented the report to Seaway at a meeting on August 29, 1990. During the meeting, Seaway instructed FDC to solicit proposals from two additional companies that Seaway specifically identified.  Shortly thereafter, FDC solicited and received proposals from the two companies.   Several meetings between FDC and Seaway followed.

FDC began negotiations, on behalf of Seaway, with the companies that submitted the most competitive proposals, including BC/BS. According to the deposition testimony of Waldo E. Yeager, Seaway's Senior Vice President of Finance, one of the issues discussed during negotiations between BC/BS and Seaway was whether BC/BS would pass along provider discounts to Seaway. Yeager testified that from discussions with BC/BS, it was Seaway's understanding that BC/BS would pass along provider discounts to Seaway. According to the deposition testimony of Floyd C. Melby,[2] a Seaway employee who assisted FDC in soliciting proposals and who reported to Yeager, BC/BS's proposal indicated the method by which BC/BS would pass along the provider discounts to Seaway.  Yeager testified that BC/BS's proposal

indicated that BC/BS would estimate the provider discounts it expected to receive in 1991, and would then pass along the estimated provider discounts to Seaway through lower administrative fees and stop-loss premiums.[3]

In October of 1990, Seaway selected BC/BS's traditional indemnity plan proposal, and selected BC/BS to administer its plan in 1991.  BC/BS began administering Seaway's plan in January of 1991 pursuant to the terms of two memoranda dated October 4, 1990 and November 5, 1990, respectively.

### C.   The 1991 Group Contract

BC/BS and Seaway executed a "Group Contract" on April 16, 1991, which was effective from January 1, 1991 to December 31, 1991 ("the 1991 Group Contract").  Under the 1991 Group Contract, BC/BS's duties included paying providers for claims made by Seaway's employees, and billing Seaway on a weekly basis for the claims paid, administrative fees, and stop-loss premiums. Section 9.5 of the 1991 Group Contract provides:

> Some of the Plan's [4] contracts with Providers [5] allow discounts, allowances, incentives, adjustments and settlements. These amounts are for the sole benefit of the Plan and the Plan will retain any payments resulting

---

[2]At the time of his deposition, Melby was an employee of BC/BS.

---

[3]The phrase "stop-loss premiums" refers to premiums for stop-loss insurance coverage–insurance coverage that caps the amount of charges for which Seaway could be held liable per contract period.

[4]The 1991 Group Contract refers to BC/BS as the "Plan" and to Seaway as the "Group" or the "Employer." (J.A. at 638.)

[5]Section 1.13 of the 1991 Group Contract defines the term "Provider" as "a hospital, facility other provider, physician or professional other provider as stated in the Certificate, Schedule of Benefits, Riders and Indorsements." (J.A. at 639.)

therefrom. All claims submitted to the Plan will have copayment and deductible amounts calculated according to the Provider's charges for Covered Services [6] without regard to the Plan's discounts, allowances or incentives.

(J.A. at 646.) The contract fell within the definition of an ERISA-covered plan, as it "was established . . . for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise . . . medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, [or] death . . . ."[7]

---

[6]Section 1.7 of the 1991 Group Contract defines the term "Covered Service" as "a Provider's service, supply, product or accommodation described in a Covered Person's Certificate or Schedule of Benefits, Rider or Indorsement for which the Plan pays." (J.A. at 638.)

[7]In full, the applicable provision states:

The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

29 U.S.C. § 1002(1). An "employee welfare benefit plan" may also be deemed an "employee benefit plan" or a "plan." *Id*. § 1002(3). The term "plan" is used in the provision defining a "fiduciary," as discussed *infra*. *Id*. § 1002(21)(A).

Addenda I and II were attached to the 1991 Group Contract, and were both incorporated by reference into the 1991 Group Contract. Addendum II provided that "[a]ll of the terms, conditions and provisions of the [1991 Group] Contract apply to this Addendum unless specifically modified herein." (J.A. at 650.) In addition, Addendum II detailed the reimbursement arrangement between BC/BS and Seaway, which is referred to as the "billed charges"[8] arrangement. Under this arrangement, BC/BS charged Seaway the amount that providers actually billed for rendering covered services to Seaway's employees. Addendum II also detailed the amount of administrative fees and stop-loss premiums for which Seaway was responsible. Neither the 1991 Group Contract nor Addendum II reflected Seaway's understanding that BC/BS would pass along estimated provider discounts to Seaway through lower administrative fees and stop-loss premiums.

At his deposition, Yeager testified that the 1991 Group Contract "appeared to be . . . a boilerplate type of agreement . . . which we . . . understood to be representing all of the details that had been discussed . . . ." (J.A. at 528.) Yeager testified that he could not recall whether FDC reviewed the 1991 Group Contract, but he was "pretty sure" that FDC did so. (J.A. at 528.) Yeager also testified that he could not recall whether he had discussed the terms of the 1991 Group Contract with FDC before he signed it on behalf of Seaway.

---

[8]Section 1(a) of Addendum II defines the term "Billed Charges" as "a Provider's published charges for Covered Services, before any amounts for Provider discounts, incentives, allowances or settlements or for deductibles or copayments." (J.A. at 650.)

### D.  The 1992 and 1993 Renewals

On behalf of Seaway, in mid-1991, FDC began negotiations, with BC/BS for a renewal of the 1991 Group Contract for the following year. An issue frequently discussed during the negotiations was whether BC/BS would pass along a higher percentage of the estimated provider discounts to Seaway than the percentage BC/BS typically offered customers. In a letter dated November 1, 1991, BC/BS informed Seaway that estimated provider discounts were being passed along to Seaway through lower administrative fees, lower stop-loss premiums, and a guaranteed discount against billed charges. BC/BS also informed Seaway that BC/BS was "at risk financially" due to its estimation of the provider discounts. (J.A. at 668.)

BC/BS and Seaway executed a renewal, which was effective from January 1, 1992 to December 31, 1992 ("the 1992 renewal"). Yeager signed the 1992 renewal on behalf of Seaway. The 1992 renewal was contained in a new Addendum II, which was incorporated by reference into the 1991 Group Contract. The 1992 renewal provided that "[a]ll of the terms, conditions and provisions of the [1991 Group] Contract apply to this Addendum unless specifically modified herein." (J.A. at 673.) The 1992 renewal indicated that BC/BS and Seaway had a billed charges arrangement. The 1992 renewal also indicated that BC/BS passed along the estimated provider discounts to Seaway through lower administrative fees, lower stop-loss premiums, and a guaranteed discount of 13.56% against billed charges.

On behalf of Seaway, in mid-1992, FDC began negotiations with BC/BS for a renewal of the 1991 Group Contract for the following year. During the negotiations, BC/BS represented that it would continue to pass along 100% of the estimated provider discounts to Seaway.

BC/BS and Seaway executed a renewal, which was effective from January 1, 1993 to December 31, 1993 ("the 1993 renewal"). Yeager signed the 1993 renewal on behalf of Seaway. The 1993 renewal was contained in a new Addendum II, which was incorporated by reference into the 1991 Group Contract. The terms of the 1993 renewal are identical, in all relevant respects, to the terms of the 1992 renewal, except the 1993 renewal changed the guaranteed discount against billed charges from 13.56% to 7.74%.

### E.  The 1994 Group Contract and Subsequent Contracts

In 1993, FDC began negotiations with BC/BS regarding contract terms for the coming year. In a letter dated September 3, 1993, FDC requested that BC/BS assure that it would pass along 100% of the estimated provider discounts to Seaway in the same manner as the past renewals. FDC also requested that BC/BS explain the distinction between the existing billed charges arrangements, under which Seaway received a guaranteed discount against billed charges, and a "paid claims" arrangement, under which Seaway would receive a pass-through of the actual provider discounts. BC/BS complied with FDC's requests in a letter dated September 13, 1993.

Instead of executing a renewal, on August 8, 1994, BC/BS and Seaway executed a "Group Contract" which was effective from January 1, 1994 to December 31, 1994 ("the 1994 Group Contract"). Section 9.5 of the 1994 Group Contract provides:

> The Group is obligated to pay the premiums specified by this Contract when due, and [BC/BS] shall have no right to any additional amounts from the Group. [BC/BS] is obligated to pay for Covered Services pursuant to this Contract, and the Group shall have no right to any additional amounts from [BC/BS].

Some of [BC/BS's] contracts with Providers allow discounts, allowances, incentives, adjustments and settlements. These amounts are for the sole benefit of [BC/BS], and [BC/BS] will retain any payments resulting therefrom. All institutional claims submitted to [BC/BS] will have co-payment and deductible amounts, when applicable, calculated according to the Provider's charges for Covered Services without regard to [BC/BS's] discounts, allowances or incentives.

(J.A. at 753.)

Addenda I, II, and III were attached to the 1994 Group Contract. Addendum III indicated that BC/BS passed along 100% of the estimated provider discounts to Seaway through lower administrative fees, lower stop-loss premiums, and a guaranteed discount of 7.98% against billed charges.

In 1995, BC/BS and Seaway switched from the billed charges arrangement to the paid claims arrangement. The contract years from 1995 to 1998 are not at issue.

### F.   The Audit

In 2000, Seaway employed Schmidt, Long & Associates, Inc. ("Schmidt") to perform an audit of BC/BS's records. Schmidt prepared a report in which it compared the provider discounts BC/BS actually received against the provider discounts BC/BS passed along to Seaway. Schmidt concluded that Seaway was owed $714,879.25 for provider discounts retained by BC/BS from 1991 to 1994, plus interest. Seaway seeks restitution in that amount on appeal.

### DISCUSSION

### A.   Standard of Review

This Court reviews a district court's grant or denial of summary judgment *de novo*. *Best v. Cyrus*, 310 F.3d 932, 934 (6th Cir. 2002). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In reviewing the district court's grant or denial of summary judgment, this Court "draw[s] all justifiable inferences in the light most favorable to the nonmoving party." *Best*, 310 F.3d at 934 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

### B.   ERISA Fiduciary Status

Under ERISA:

[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). "ERISA also defines a 'person' to include a corporation." *Hamilton v. Carell*, 243 F.3d 992, 998 (6th Cir. 2001) (citing 29 U.S.C. § 1002(9)). "The Supreme Court has recognized that ERISA 'defines

"fiduciary" not in terms of formal trusteeship, but in functional terms of control and authority over the plan . . . .'" *Id*. (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993)). This Court has stated:

> [W]e must examine the conduct at issue to determine whether it constitutes "management" or "administration" of the plan, giving rise to fiduciary concerns, or merely a business decision that has an effect on an ERISA plan not subject to fiduciary standards.

*Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 718 (6th Cir. 2000) (internal quotation marks and alterations omitted) (citing *Sengpiel v. B.F. Goodrich Co.*, 156 F.3d 660, 666 (6th Cir. 1998)). Thus,

> [i]n every case charging breach of ERISA fiduciary duty . . . the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint.

*Pegram v. Herdrich*, 530 U.S. 211, 226 (2000); *see also Mich. Affiliated Healthcare Sys., Inc. v. CC Sys. Corp.*, 139 F.3d 546, 549 (6th Cir. 1998) (recognizing that the definition of an ERISA fiduciary not only includes persons specifically named as fiduciaries by the plan, but also any person who exercises discretionary control or authority over a plan's management, administration, or assets).

In its October 10, 2001 order, the district court held that BC/BS did not act as an ERISA fiduciary when negotiating contract terms with Seaway. The district court reasoned:

> At that point[,] [BC/BS] was in no position to exercise discretion or authority or administer the plan. The plan was not yet in existence . . . . During negotiations, Seaway was free to seek and chose a different administrator with a better plan and lower costs.
> . . . .
> ERISA regulates the management and administration of employee benefit plans. Here, Seaway asks this Court to regulate the *establishment* of a plan. ERISA is not intended to regulate such conduct. To reiterate, ERISA is not involved in regulating conduct affecting the establishment of a plan or with its terms. Simply put, ERISA's concern is with the elements of a plan and its administration after it has been established.

(J.A. at 222) (emphasis in original) (internal quotation marks and citations omitted). The district court also held that Section 9.5 of the 1991 and 1994 Group Contracts authorized BC/BS to retain the actual provider discounts for its sole benefit. The district court reasoned:

> The administrative services contract[s] clearly state[] that provider discounts are for the "sole benefit" of [BC/BS]. Seaway cannot point to any language in the contract[s] that would provide Seaway with a right to the actual provider discounts during 1991 through 1994. According to the terms of the administrative services contract[s], Seaway had no right to a pass through of actual provider discounts.
> . . . .
> On its face, § 9.5 is clear and unambiguous. Nonetheless, Seaway asks that I look past the face of the administrative services contract[s] to extrinsic evidence. Seaway contends that there is a "latent" ambiguity in § 9.5 . . . . I decline, however, to have recourse to extrinsic evidence to create ambiguity in § 9.5.

(J.A. at 224-25.) In its order, the district court only considered whether BC/BS acted as a fiduciary when

negotiating contract terms with Seaway, and when complying with Section 9.5 of the 1991 and 1994 Group Contracts.

On appeal, Seaway argues that the district court erred in failing to consider whether BC/BS acted as an ERISA fiduciary when exercising control over Seaway's plan assets. Medical Mutual argues that Seaway waived for appellate review the argument that BC/BS acted as fiduciary when exercising control over Seaway's plan assets because Seaway did not raise the argument in the district court. Regardless of whether Seaway raised the argument in the district court, we hold that the argument is without merit.

Seaway argues that BC/BS exercised continuing control over Seaway's plan assets inasmuch as Seaway paid funds to BC/BS on a weekly basis, BC/BS in turn paid a portion of the funds to providers for payment of billed charges incurred by Seaway's employees, and BC/BS retained the remaining portion of the funds for its sole benefit. Seaway claims that the remaining portion of the funds arose from the provider discounts received by BC/BS. Seaway further argues that BC/BS's control over funds in the form of plan assets gave rise to ERISA fiduciary status.

Medical Mutual argues that because Section 9.5 of the 1991 and 1994 Group Contracts authorized BC/BS to retain any funds resulting from the provider discounts for its sole benefit, such funds belonged to BC/BS and not to the plan. Medical Mutual therefore argues that BC/BS's control over such funds did not give rise to ERISA fiduciary status. We agree.

In *Schulist v. Blue Cross & Blue Shield*, 717 F.2d 1127 (7th Cir. 1983), the plaintiffs were trustees of employee health and welfare benefit plans issued by BC/BS. The plaintiffs argued that BC/BS breached its fiduciary duties under ERISA by retaining excess premiums paid by the plaintiffs. The series of contracts between the parties did not provide that the

excess premiums were to be refunded to the plaintiffs. The Seventh Circuit held that BC/BS was not an ERISA fiduciary because BC/BS did not exercise discretionary authority with respect to the setting of the premium rates. *Id.* at 1132. The Seventh Circuit reasoned that the parties had entered into an "arm's length bargain presumably governed by competition in the marketplace" that specified the premium rates. *Id.*

In *Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.*, 805 F.2d 732, 737 (7th Cir. 1986), the Seventh Circuit clarified its holding in *Schulist* as follows:

> *Schulist* stands for the proposition that if a specific [contract] term (not a grant of power to change terms) is bargained for at arm's length, adherence to that term is not a breach of fiduciary duty. No discretion is exercised when an insurer merely adheres to a specific contract term. When a contract, however, grants an insurer discretionary authority, even though the contract itself is the product of an arm's length bargain, the insurer may be a fiduciary.

The plaintiffs in *Ed Miniat* were participating employers in a retirement life reserve insurance plan issued by the defendants. The plaintiffs argued that the defendants breached their fiduciary duties under ERISA by retaining more than one-half of the premiums paid by the plaintiffs, without having issued any insurance under the plan. The Seventh Circuit held that the plaintiffs alleged a claim that the defendants were ERISA fiduciaries. *Ed Miniat*, 805 F.2d at 738. The Seventh Circuit reasoned that the defendants' power to amend or alter the terms of the plan constituted the requisite discretionary authority over plan assets. *Id.*

We agree with the Seventh Circuit's reasoning that where parties enter into a contract term at arm's length and where the term confers on one party the unilateral right to retain funds as compensation for services rendered with respect to

an ERISA plan, that party's adherence to the term does not give rise to ERISA fiduciary status unless the term authorizes the party to exercise discretion with respect to that right. *See Ed Miniat*, 805 F.2d at 737; *Schulist*, 717 F.2d at 1132; *see also F.H. Krear & Co. v. Nineteen Named Trs.*, 810 F.2d 1250, 1259 (2nd Cir. 1987) (stating that "after a person has entered into an agreement with an ERISA-covered plan, the agreement may give it such control over factors that determine the actual amount of its compensation that the person thereby becomes an ERISA fiduciary with respect to that compensation").

Contrary to Seaway's argument, we find that Section 9.5 of the 1991 and 1994 Group Contracts does not authorize BC/BS to exercise discretion with respect to any funds resulting from the provider discounts. Section 9.5 specifically authorizes BC/BS to retain such funds for its "sole benefit." The "sole benefit" language precludes BC/BS from exercising discretion with respect to such funds. We therefore hold that BC/BS's adherence to Section 9.5 did not give rise to ERISA fiduciary status. *See Ed Miniat*, 805 F.2d at 737; *Schulist*, 717 F.2d at 1132.

## CONCLUSION

For the forgoing reasons, we **AFFIRM** the district court's order.