RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0100p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

HI-LEX CONTROLS, INC., HI-LEX AMERICA, INC.,
and HI-LEX CORPORATION HEALTH AND WELFARE
BENEFIT PLAN,
       *Plaintiffs-Appellees/Cross-Appellants,*

*v.*

BLUE CROSS BLUE SHIELD OF MICHIGAN,
       *Defendant-Appellant/Cross-Appellee.*

Nos. 13-1773/1859

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit
No. 2:11-cv-12557—Victoria A. Roberts, District Judge.

Argued: March 19, 2014

Decided and Filed: May 14, 2014

BEFORE: KEITH, SILER, and ROGERS, Circuit Judges.

---

### COUNSEL

**ARGUED:** Robin Springberg Parry, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Amicus Curiae. James J. Walsh, BODMAN PLC, Ann Arbor, Michigan, for Appellant/Cross-Appellee. Perrin Rynders, VARNUM, Grand Rapids, Michigan, for Appellees/Cross-Appellants. **ON BRIEF:** James J. Walsh, G. Christopher, Bernard, Rebecca D'Arcy O'Reilly, BODMAN PLC, Ann Arbor, Michigan, for Appellant/Cross-Appellee. Perrin Rynders, Aaron M. Phelps, Stephen F. MacGuidwin, VARNUM, Grand Rapids, Michigan, for Appellees/Cross-Appellants. Robin Springberg Parry, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., Ronald S. Lederman, Gerard J. Andree, SULLIVAN, WARD, ASHER & PATTON, P.C., Southfield, Michigan, for Amici Curiae.

1

---

**OPINION**

---

SILER, Circuit Judge.  The Hi-Lex corporation, on behalf of itself and the Hi-Lex Health & Welfare Plan, filed suit in 2011 alleging that Blue Cross Blue Shield of Michigan (BCBSM) breached its fiduciary duty under the Employee Retirement Income Security Act of 1974 (ERISA) by inflating hospital claims with hidden surcharges in order to retain additional administrative compensation.  The district court granted summary judgment to Hi-Lex on the issue of whether BCBSM functioned as an ERISA fiduciary and whether BCBSM's actions amounted to self-dealing.  A bench trial followed in which the district court found that Hi-Lex's claims were not time-barred and that BCBSM had violated ERISA's general fiduciary obligations under 29 U.S.C. § 1104(a).  The district court also awarded pre- and post-judgment interest.  We **AFFIRM**.

**I.**

Hi-Lex is an automotive supply company with approximately 1,300 employees.  BCBSM is non-profit entity regulated by the state of Michigan that contracts to serve as a third-party administrator (TPA) for companies and organizations that self-fund their health benefit plans.

Since 1991, BCBSM has been the contracted TPA for Hi-Lex's Health and Welfare Benefit Plan (Health Plan).  The terms under which BCBSM served as the Health Plan's TPA are set forth in two Administrative Services Contracts (ASCs) the parties entered into in 1991 and 2002, respectively.  The parties renewed those terms each year from 1991 to 2011 by executing a "Schedule A" document.

Under the ASCs, BCBSM agreed to process healthcare claims for Hi-Lex's employees and grant those employees access to BCBSM's provider networks.  In exchange for its services, BCBSM received compensation in the form of an "administrative fee" – an amount set forth in the Schedule A on a per employee, per month basis.

In 1993, BCBSM implemented a new system whereby it would retain additional revenue by adding certain mark-ups to hospital claims paid by its ASC clients.  These fees were charged

in addition to the "administrative fee" that BCBSM collected from Hi-Lex under a separate portion of the ASC. Thus, regardless of the amount BCBSM was required to pay a hospital for a given service, it reported a higher amount that was then paid by the self-insured client. The difference between the amount billed to the client and the amount paid to the hospital was retained by BCBSM. This new system was termed "Retention Reallocation."

The fees involved in this new system have been termed "Disputed Fees" by the district court. They include:

A. Charges for access to the Blue Cross participating provider and hospital network (Provider Network Fee);
B. Contribution to the Blue Cross contingency reserve (contingency/risk fee);
C. Other Than Group subsidy (OTG fee); and
D. a retiree surcharge.

Hi-Lex asserts that it was unaware of the existence of the Disputed Fees until 2011, when BCBSM disclosed to the company in a letter the existence of the fees and described them as "administrative compensation."

Following the disclosure, Hi-Lex sued BCBSM, alleging violations of ERISA as well as various state law claims. The district court dismissed the company's state law claims as preempted, but granted Hi-Lex summary judgment on its claim that BCBSM functioned as an ERISA fiduciary and that BCBSM had violated ERISA by self-dealing. Furthermore, after a nine-day bench trial, the district court ruled that BCBSM had violated its general fiduciary duty under § 1104(a) and that Hi-Lex's claims were not time-barred. The court awarded Hi-Lex $5,111,431 in damages and prejudgment interest in the amount of $914,241.

BCBSM asserts that the district court erred by (1) finding the company was an ERISA fiduciary, (2) ruling that BCBSM had breached its fiduciary duty under ERISA § 1104(a), (3) holding that BCBSM had conducted "self-dealing" in violation of ERISA § 1106(b)(1), and (4) concluding that Hi-Lex's claims were not time-barred. Hi-Lex cross-appealed, arguing that the district court abused its discretion by ordering an insufficient prejudgment interest award.

**II.**

We review a district court's summary judgment rulings de novo. *Pipefitters Local 636 Ins. Fund v. Blue Cross & Blue Shield of Mich.*, 722 F.3d 861, 865 (6th Cir. 2013) (*Pipefitters IV*). The same standard applies when this court reviews "a district court's determination regarding ERISA-fiduciary status." *McLemore v. Regions Bank*, 682 F.3d 414, 422 (6th Cir. 2012). After a bench trial, a court's legal conclusions are reviewed de novo while its factual findings are reviewed for clear error. *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 448 (6th Cir. 2002).

**III.**

**A.    BCBSM's ERISA Fiduciary Status**

A threshold issue in this case is whether BCBSM functioned as an ERISA fiduciary for Hi-Lex's Health Plan. In relevant part, ERISA provides that

> a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan *or* exercises any authority or control respecting management or disposition of its assets, . . .  or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A) (emphasis added). The term *person* is defined broadly to include a corporation such as BCBSM. *Id.* § 1002(9). In *Briscoe v. Fine*, we found this statute "impose[d] fiduciary duties not only on those entities that exercise *discretionary* control over the disposition of plan assets, but also impose[d] such duties on entities or companies that exercise '*any* authority or control' over the covered assets." 444 F.3d 478, 490-91 (6th Cir. 2006). Applying that standard, we recently held that BCBSM functioned as an ERISA fiduciary when it served as a TPA for a separate client under the same ASC terms at issue here. *See Pipefitters IV*, 722 F.3d at 865-67. In that case, we found that BCBSM functioned as an ERISA fiduciary with respect to hidden OTG fees that it unilaterally added to hospital claims subsequently paid by the Pipefitters Fund. *Id.* at 866-67.

BCBSM argues that the decisions in *McLemore*, 682 F.3d at 422-24, and *Seaway Food Town, Inc. v. Med. Mut. of Ohio*, 347 F.3d 610, 616-19 (6th Cir. 2003), support its right to collect fees per the terms of its contract with Hi-Lex. In *Seaway*, however, we qualified our holding by

noting that while simple adherence to a contract's term giving a party "the unilateral right to retain funds as compensation" does not give rise to fiduciary status, a "term [that] authorizes [a] party to exercise discretion with respect to that right" does. 347 F.3d at 619. Acknowledging this, BCBSM argues that it exercised no discretion with respect to the Disputed Fees because they were part of the standard pricing arrangement for the company's entire ASC line of business. The record, though, supports a finding that the imposition of the Disputed Fees was not universal. The district court cited an email in which BCBSM's underwriting manager, Cindy Garofali, acknowledged that individual underwriters for BCBSM had the "flexibility to determine" how and when access fees were charged to self-funded ASC clients. Moreover, Garofali admitted during testimony at trial that the Disputed Fees were sometimes waived entirely for certain self-funded customers. *See also Pipefitters Local 636 Ins. Fund v. Blue Cross & Blue Shield of Mich.*, 213 F. App'x 473, 475 (6th Cir. 2007) (*Pipefitters I*) (noting that self-insured clients were not always required to pay the Disputed Fees). The district court did not err in finding that the Disputed Fees were discretionarily imposed.[1]

BCBSM also attempts to distinguish this case from *Pipefitters IV* by arguing that the funds which paid the Disputed Fees were Hi-Lex's corporate assets, not "plan assets" subject to ERISA protections. In *Pipefitters IV*, corporate funds from several employers were first pooled together in a trust account, the Pipefitters Fund, which then remitted funds to BCBSM in its capacity as a TPA. In this case, the funds Hi-Lex sent to BCBSM in its role as TPA came not from a formal trust account, but from a combination of the company's general funds and Hi-Lex employee contributions.

Department of Labor regulations state that employee contributions constitute plan assets under ERISA once they are "segregated from the employer's general assets." 29 C.F.R. § 2510.3-102(a)(1). Thus, the health care contributions deducted from Hi-Lex employees'

---

[1]Counsel for BCBSM acknowledged as much during oral argument in *Pipefitters IV*. "But Your Honor, again, I really need to stress, getting caught up in the *Hi-Lex* case I think is a mistake because the fees are totally different. It's not … that … those are about fees where there is discretion." Oral Argument at 22:28, *Pipefitters IV*, 722 F.3d 861 (6th Cir. 2013).

paychecks and sent to BCBSM to pay claims and administrative costs qualify as plan assets.[2] *See* U.S. Dep't of Labor, Advisory Op. No. 92-24A, 1992 WL 337539, *2 (Nov. 6, 1992) (AO 92-24A) ("all amounts that a participant pays to or has withheld by an employer for purposes of obtaining benefits under a plan will constitute plan assets"); *see also United States v. Grizzle*, 933 F.2d 943, 946-47 (11th Cir. 1991) (finding that plan assets may be composed of employee contributions even before their delivery to the plan). BCBSM correctly notes, though, that employee contributions represented only a fraction of the funds it received from Hi-Lex and those contributions first began in 2003—several years after the Disputed Fee compensation system was initiated. The pertinent question, then, is whether the *employer* contributions that Hi-Lex sent to BCBSM must also be considered plan assets.

"[T]he assets of an employee benefit plan generally are to be identified on the basis of ordinary notions of property rights." AO 92-24A at *2. Under this analysis, "the assets of a welfare plan generally include any property, tangible or intangible, in which the plan has a beneficial ownership interest." *Id.* Making the plan assets' determination "therefore requires consideration of any contract or other legal instrument involving the plan, as well as the actions and representations of the parties involved." *Id.* Furthermore, the "drawing benefit checks on a TPA account, as opposed to an employer account, may suggest to participants that there is an independent source of funds securing payment of their benefits under the plan." *Id.*

In this case, the Summary Plan Description (SPD) – which ERISA requires to be distributed to plan participants[3] – establishes that Hi-Lex's intention was to place plan assets for its self-funded Health Plan with BCBSM in its capacity as TPA. The SPD specifically notes that Hi-Lex "is not [a] direct payor of any benefits" and "no special fund or trust" exists from which self-insured benefits are paid.[4] Instead, the SPD states that a TPA (designated later in the document as BCBSM) has been hired, and it "reviews [plan participant's] claims and pays

---

[2]BCBSM's contention that it lacked notice of any employee contributions in the funds it received from Hi-Lex is not supported by the record. The Summary Plan Description (SPD) states that Hi-Lex and its employees "share the cost of participating in the Plan."

[3]*See* 29 U.S.C. § 1024(b).

[4]ERISA permits this arrangement. *See* 29 U.S.C. § 1103(b).

benefits from the money we provide." Moreover, although the SPD gives final claims determination to Hi-Lex, the document makes clear that enrollees must make their initial benefit claims to BCBSM, which has both the funds and the discretion to pay claims.[5] The language in the ASC does nothing to alter the understanding that BCBSM in its role as TPA would be holding funds to pay the healthcare expenses of Plan beneficiaries – a group the ASC terms "enrollees."[6] Indeed, the quarterly statements received by Hi-Lex show that the funds it sent to BCBSM were, predictably, spent covering the health expenses and administrative costs of plan beneficiaries.

While BCBSM attempts to characterize its arrangement with Hi-Lex as a service agreement between two companies – with no thought toward ERISA and its protections – that argument is unavailing. The SPD contains an entire section disclosing plan beneficiaries' rights under ERISA, including the right to sue "the fiduciaries" (plural) if they "misuse the Plan's money." If BCBSM's interpretation of the parties' arrangement were accurate, there would only be a single fiduciary, Hi-Lex, the named Plan Administrator. Additionally, although the ASC lacks any specific reference to plan assets, it does recognize that BCBSM may have certain responsibilities "under ERISA" that it cannot contract around.[7] Furthermore, in practice, BCBSM annually submitted data to Hi-Lex especially designed for use on the company's ERISA-mandated DOL 5500 forms.[8] Collectively, these "actions and representations" establish that BCBSM, Hi-Lex and the company's employees all understood that BCBSM would be holding ERISA-regulated funds to pay the health expenses and administrative costs of enrollees in the Hi-Lex Health Plan. As a result, Hi-Lex's Plan beneficiaries had a reasonable expectation of a "beneficial ownership interest" in the funds held by BCBSM.

---

[5]BCBSM maintained exclusive check-writing authority over the Comerica Bank account into which Hi-Lex's funds were wired as mandated by the Schedule A.

[6]Although the ASC was made between the "Group" (Hi-Lex) and BCBSM, its provisions regarding health claims processing and payment correlate with those found in the SPD.

[7]A fiduciary is established under ERISA by a party's functional role and that responsibility cannot be abrogated by contract. *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993); *Briscoe*, 444 F.3d at 492.

[8]The Form 5500 Series is required by the Department of Labor to fulfill certain reporting requirements under ERISA's Titles I and IV.

BCBSM makes much of the fact that neither it nor Hi-Lex had a separate bank account set aside exclusively for the funds intended to pay enrollee health expenses. BCBSM cannot, however, cite any case law requiring such an arrangement for the existence of ERISA plan assets. Our court has found that plan assets *can* exist when a company directly funds an ERISA plan from its corporate assets and the contracted TPA holds those funds in a general account. *See Libbey-Owens-Ford Co. v. Blue Cross & Blue Shield Mut. of Ohio*, 982 F.2d 1031, 1036 (6th Cir. 1993) (finding that Blue Cross was a fiduciary "because [it] could earmark the funds that Libbey-Owens-Ford allocated to the plan").

Finally, trust law, which BCBSM acknowledges should guide the court in its fiduciary analysis, favors Hi-Lex's position.

> When one person transfers funds to another, it depends on the manifested intention of the parties whether the relationship created is that of trust or debt. If the intention is that the money shall be kept or used as a separate fund for the benefit of the payor or *one or more third persons*, a trust is created.

Restatement (Third) of Trusts § 5 cmt. k (2003) (emphasis added); s*ee also Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 110-11 (1989) (noting the value of trust law in interpreting ERISA's responsibility provisions). Thus, while a formal trust was never created in this case, common law supports the conclusion that BCBSM was holding the funds wired by Hi-Lex "in trust" for the purpose of paying plan beneficiaries' health claims and administrative costs. Accordingly, the district court did not err in finding that BCBSM held plan assets of the Hi-Lex Health Plan and, in doing so, functioned as an ERISA fiduciary.

**B.     ERISA's Statute of Limitations**

A separate threshold issue in this case involves ERISA's statute of limitations for actions brought under 29 U.S.C. §§ 1104(a) and 1106(b). "[T]he statute requires that a claim be brought within three years of the date the plaintiff first obtained 'actual knowledge' of the breach or violation forming the basis for the claim." *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 548 (6th Cir. 2012). "'Actual knowledge' means 'knowledge of the underlying conduct giving rise to the alleged violation,' rather than 'knowledge that the underlying conduct violates ERISA.'" *Id.* (quoting *Wright v. Heyne*, 349 F.3d 321, 331 (6th Cir. 2003)). However, the statute provides an

exception for a case involving "fraud or concealment," extending the filing period to a date no later than six years after the time of discovery of the violation. *See id.*; 29 U.S.C. § 1113.

In this case, the district court found that Hi-Lex obtained knowledge of the Disputed Fees in August 2007[9] – a finding the company does not dispute. Since Hi-Lex filed suit in June 2011, it must avail itself of ERISA's "fraud or concealment" exception or its action is time-barred. BCBSM asserts that the district court erred by not finding that Hi-Lex had actual knowledge of the Disputed Fees before August 2007 or, alternatively, that the company's failure to exercise due diligence led to its lack of knowledge regarding the fees.

## 1.     Timeframe for Actual Knowledge

There is no evidence in the record that any ASC signed before 2002 contained language pertaining to the Disputed Fees. The Schedule As from 1995 to 2002 contained a single sentence that BCBSM contends relates to the Disputed Fees: "Your hospital claims cost reflects certain charges for provider network access, contingency, and other subsidies as appropriate." This statement, however, did not appear in the "Administrative Charge" section of the document where other recurring expenses related to BCBSM's compensation are located. It also omitted the critical fact that the Disputed Fees would be retained by BCBSM as additional compensation and not paid to hospitals.

In 2002, language was added to the ASC that BCBSM contends further explains the Disputed Fees:

> The Provider Network Fee, contingency, and any cost transfer subsidies or surcharges ordered by the State Insurance Commissioner as authorized pursuant to 1980 P.A. 350 will be reflected in the hospital claims cost contained in Amounts Billed.

This language, though, is similarly opaque and misleading. *See Pipefitters IV*, 722 F.3d at 867. The phrase "ordered by the State Insurance Commissioner" is not accurate because the Insurance Commissioner neither ordered BCBSM customers to pay these fees nor had the authority to do so. Additionally, because the phrase "Amounts Billed" is defined in the ASC to mean "the

---

[9]The district court held that Hi-Lex should have discovered the Disputed Fees when a "Value of Blue" pie chart that depicted the charges was presented to the company as part of an annual settlement meeting with BCBSM on August 21, 2007.

amount [Hi-Lex] owes in accordance with BCBSM's standard operating procedures *for payment of Enrollees' claims*," this term provides no notice that BCBSM will be retaining additional administrative compensation from these charges.[10]   Furthermore, even to the extent that the contract documents provide some hint about additional fees, those documents describe only what *might* happen in the future.  Every year, however, Hi-Lex received DOL 5500 certification sheets from BCBSM which purported to show the administrative compensation that BCBSM was *actually* receiving.  The 5500 Forms, though, indicated that BCBSM was not retaining any administrative compensation beyond that clearly delineated in the ASC and Schedule As.[11]   The district court did not err in finding that Hi-Lex gained knowledge of the Disputed Fees beginning in August 2007.

## 2.    Fraud or Concealment Exception

Unless ERISA's "fraud or concealment" exception applies, Hi-Lex's action is time-barred because it was filed in June 2011, more than three years after the company acquired knowledge of the Disputed Fees.  Other circuit courts have split when interpreting the scope of the fraud or concealment exception.  *Compare Larson v. Northrop Corp.*, 21 F.3d 1164, 1174 (D.C. Cir. 1994) (finding that § 1113 requires a defendant to have actively engaged in concealment), *with Caputo v. Pfizer, Inc.*, 267 F.3d 181, 192-93 (2d Cir. 2001) (holding that the fraud or concealment provision applies to actions for breach of fiduciary duty in which the underlying action itself sounds in fraud).  We have not yet taken a position on these two competing interpretations.  *See Cataldo*, 676 F.3d at 548-51 (noting that an "open question" exists in the Sixth Circuit on the scope of the fraud or concealment exception).  To resolve this case, though, it remains unnecessary for us to take sides because, as the district court found, BCBSM breached its fiduciary duty by committing fraud and then acting to conceal that fraud.

---

[10]Language in a Schedule A from 2006 did note that "[a] portion of [Hi-Lex's] hospital savings has been retained by BCBSM" to cover provider network costs.  However, even assuming that language provided actual knowledge to Hi-Lex, it did so within the 6-year statute of limitations period under ERISA's "fraud or concealment" exception.

[11]In the certifications provided by BCBSM to help prepare DOL 5500s, the Disputed Fees were included on the line for "Claims Paid."  The "Administration" section that should have included all administrative fees listed only those fees disclosed by BCBSM.  Lines for "Other Expenses" and "Risk and Contingency" were either marked zero or not applicable each year.

BCBSM committed fraud by knowingly misrepresenting and omitting information about the Disputed Fees in contract documents. Specifically, the ASC, the Schedule As, the monthly claims reports, and the quarterly and annual settlements all misled Hi-Lex into believing that the disclosed administrative fees and charges were the only form of compensation that BCBSM retained for itself.

BCBSM also "engaged in a course of conduct designed to conceal evidence of [its] alleged wrong-doing." *Larson*, 21 F.3d at 1172. After rumors emerged that BCBSM had "hidden fees" in the early 2000s, representatives from BCBSM told various insurance brokers that customers got 100% of the hospital discounts and that "Blue Cross does not hold anything back." BCBSM made similar assurances to Hi-Lex, stating in an annual renewal document, "Your BCBSM Administrative Fee is all-inclusive." BCBSM also gave a misleading response to a Request for Proposal (RFP) issued by Hi-Lex by denying that it charged "Access Fees." This response helped sustain the illusion that BCBSM was more cost-competitive than other TPAs who responded to the RFP. Finally, the Form 5500 certification sheets that BCBSM provided to Hi-Lex every year concealed the additional administrative compensation that was being taken in the form of the Disputed Fees.

### 3.     Due Diligence

A common requirement of both the *Caputo* and *Larson* standards for determining "fraud or concealment," is that an ERISA plaintiff's failure to discover a fiduciary violation must not have been attributable to a lack of due diligence on his part. *See Larson*, 21 F.3d at 1172 (finding that plaintiffs must not have been on notice about evidence of a fiduciary breach, "despite their exercise of diligence"); *Caputo*, 267 F.3d at 192-93 (holding that "plaintiffs' action [was] timely because it was brought within six years of when, with due diligence, they should have discovered the fraud").

BCBSM argues that Hi-Lex failed to exercise due diligence because the company's finance officials, Thomas Welsh and John Flack, did not thoroughly read the 2002 ASC or the annual Schedule A renewal documents. While that assertion is accurate, it represents an incomplete picture of the actions of those officials. The district court found that "Welsh carefully reviewed all financial reports from BCBSM" and maintained that "financial data in a

master spreadsheet." Moreover, after a healthcare consultant, hired by Hi-Lex, raised a question about ambiguous language in the Schedule A, "Welsh diligently followed up with BCBSM, only to never get a response." Later, Hi-Lex's RFP specifically asked TPAs whether they charged any "Network Access/Management Fees" or "Other Fees" and BCBSM answered "N/A." Hi-Lex officials reasonably relied on their consultant who interpreted that response to mean there were no Disputed Fees in addition to BCBSM's disclosed Administrative Fees. When Flack assumed the CFO role from Welsh, he continued to review the monthly claims reports from BCBSM and record the data into the master spreadsheet. As before, though, none of those reports gave any indication that claims included administrative fees paid to BCBSM. The district court did not err in finding that Hi-Lex acted with diligence in reviewing the administrative costs of its health plan until BCBSM presented its Value of Blue Report in August 2007.

Moreover, if Hi-Lex had not acted diligently, the Supreme Court has held that when a "discovery of the facts constituting the violation" provision exists in a statute of limitations, courts must also examine whether "a hypothetical reasonably diligent plaintiff would have discovered [those facts]." *Merck & Co. v. Reynolds*, 559 U.S. 633, 646-47 (2010). The district court correctly found that such a company would not have discovered the Disputed Fees until August 2007.

The contract documents (ASC and Schedule As until 2006) fail to reference or explain the Disputed Fees in a way that a reasonable reader would understand that those fees involved additional compensation for BCBSM. Indeed, BCBSM's own account manager, Sandy Ham, who read and signed multiple Schedule As from 1999 to 2005, testified that she did not understand anything about the Disputed Fees, including their existence. Additionally, six insurance brokers, who had years of experience working with self-funded customers, testified at trial that they had no understanding of the fees until 2007 when BCBSM began disclosing more information. If health industry experts and BCBSM's account manager – who was tasked with explaining contract documents to customers – did not understand that the Disputed Fees were being authorized by contract documents, then a "reasonably diligent" CFO could not be expected to know about them. Besides the contract documents, BCBSM made discovery of its Disputed

Fee practice more difficult for a hypothetical diligent customer by not separately accounting for those fees in its monthly, quarterly, and annual claims reports or in the information sheets it provided to help customers prepare DOL 5500 Forms.  Finally, according to BCBSM's own survey of its self-insured customers, a substantial majority – 83% – did not know the Disputed Fees were being charged.

The claims in this case did not violate ERISA's statute of limitations because Hi-Lex can validly invoke the extended six-year period permitted by the fraud or concealment exception.

## IV.

### A.     § 1106(b)(1)

A fiduciary with respect to an ERISA plan "shall not deal with the assets of the plan in his own interest or for his own account."  29 U.S.C. § 1106(b)(1).  As interpreted by this court, that statute contains an "absolute bar against self dealing." *Brock v. Hendershott*, 840 F.2d 339, 341 (6th Cir. 1988).  Because this case involves the same ASC, same defendant, and same allegations, our decision in *Pipefitters IV* controls with respect to the § 1106(b)(1) claim.  *See Pipefitters IV*, 722 F.3d at 868 (holding that BCBSM's use of fees it discretionarily charged "for its own account" is "exactly the sort of self-dealing that ERISA prohibits fiduciaries from engaging in").

BCBSM argues it is entitled to present a "reasonable compensation" defense under 29 U.S.C. §§ 1108(b)(2) and (c)(2).  In support, it cites *Harley v. Minn. Mining & Mfg. Co.*, 284 F.3d 901, 908-09 (8th Cir. 2002).  However, the majority of courts that have examined this statutory interpretation issue have held that § 1108 applies only to transactions under § 1106(a), not § 1106(b).  *See, e.g., Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 93-96 (3d Cir. 2012); *Patelco Credit Union v. Sahni*, 262 F.3d 897, 910-11 (9th Cir. 2001); *Chao v. Linder*, 421 F. Supp. 2d 1129, 1135-36 (N.D. Ill. 2006); *LaScala v. Scrufari*, 96 F. Supp. 2d 233, 238 (W.D.N.Y. 2000); *Daniels v. Nat'l Emp. Benefits Servs., Inc.*, 858 F. Supp. 684, 693 (N.D. Ohio 1994); *Donovan v. Daugherty*, 550 F. Supp. 390, 404 n.3 (S.D. Ala. 1982); *Gilliam v. Edwards*, 492 F. Supp. 1255, 1262 (D.N.J. 1980); *Marshall v. Kelly*, 465 F. Supp. 341, 353 (W.D. Okla. 1978).  The Department of Labor agrees with these courts.  *See* 29 C.F.R. § 2550.408b-2(a)(3) (ERISA "section 408(b)(2) does not contain an exemption from acts described in section 406(b)(1)").

We decline BCBSM's invitation to apply the reasonable compensation provisions found in §§ 1108(b)(2) and (c)(2) to the self-dealing restriction in § 1106(b)(1).

**B.    § 1104(a)**

ERISA imposes three broad duties on qualified fiduciaries:  (1) the duty of loyalty, (2) the prudent person fiduciary obligation, and (3) the exclusive benefit rule.  *Pirelli Armstrong Tire Corp.*, 305 F.3d at 448-49.  Collectively, these duties serve the goal of ensuring that ERISA fiduciaries act "solely in the interest of [plan] participants and beneficiaries."  29 U.S.C. § 1104(a)(1).  Our analysis of the § 1104(a) claim in *Pipefitters IV* is again determinative for this case.  *See* 722 F.3d at 867-69.  There, as here, when a "fiduciary uses a plan's funds for its own purposes, . . . such a fiduciary is liable under § 1104(a)(1) and § 1106(b)(1)."  *Id.* at 868 (citing *Guyan Int'l, Inc. v. Prof'l Benefits Adm'rs, Inc.*, 689 F.3d 793, 798-99 (6th Cir. 2012)).

**V.**

After ruling for the plaintiffs in this case, the district court awarded prejudgment interest in accordance with 28 U.S.C. § 1961.  Although ERISA does not require a prejudgment interest award to prevailing plaintiffs, this court has "long recognized that the district court may do so at its discretion in accordance with general equitable principles."  *Caffey v. Unum Life Ins. Co.*, 302 F.3d 576, 585 (6th Cir. 2002) (quoting *Ford v. Uniroyal Pension Plan*, 154 F.3d 613, 616 (6th Cir. 1998)).

Hi-Lex asserts that the district court abused its discretion in two respects:  (1) the court failed to make specific findings of fact with respect to its decision regarding prejudgment interest, and (2) the § 1961 interest calculation undercompensates Hi-Lex for the lost interest value of the Disputed Fees.

Hi-Lex, through its expert, Neil Steinkamp, was the only party to offer testimony regarding prejudgment interest.  BCBSM relies on its critique of Steinkamp's analysis, noting that he produced no evidence to support his conclusion that Hi-Lex would have invested the savings from the Disputed Fees in corporate bonds.  The district court's relevant factual finding was that Steinkamp's prejudgment interest rate computation would overcompensate Hi-Lex for its loss.  Moreover, Hi-Lex's contention that *Drennan v. Gen. Motors Corp.*, 977 F.2d 246 (6th

Cir. 1992), requires reversal on this point is incorrect.  That case stands for the proposition that a district court errs by not making findings of fact when deciding *whether* to award discretionary prejudgment interest. The issue here is whether the court made sufficient findings with respect to its prejudgment interest *calculation*.

> In *Schumacher v. AK Steel Corp. Ret. Accumulation Pension Plan*, we held that
>
> [a] proper determination of pre-judgment interest involves a consideration of various case-specific factors and competing interests to achieve a just result. While we have upheld awards of pre-judgment interest calculated pursuant to 28 U.S.C. § 1961, a mechanical application of the rate *at the time of the award* amounts to an abuse of discretion.

711 F.3d 675, 686 (6th Cir. 2013) (emphasis added).  The *Schumacher* court found that a district court's use of a single rate – 0.12% – calculated at the time of the award under § 1961 represented an abuse of discretion.

In this case, however, the district court did not use a single rate in calculating the prejudgment interest.  Instead, the court utilized a blended rate for each of the 17 years during which the Disputed Fees were charged – a range from 6.13% to 0.14%.  Thus, on the $5,111,431 damages award, the district court calculated the prejudgment interest at $914,241.  Because the district court avoided a mechanical application of § 1961, it did not abuse its discretion in calculating the prejudgment interest award.

## VI.

For the foregoing reasons, we **AFFIRM** the judgment of the district court.